## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MELODIE ADAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-2179 |
| | § | |
| UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

This case involves the termination of long-term disability benefits.  Plaintiff Melodie

Adams applied for such benefits in 2000 under a group insurance policy Unum Life

Insurance Company of America issued to her employer, Compaq Computer Corporation, as

part of its long-term disability plan.  Adams identified fibromyalgia, carpal tunnel syndrome,

and depression as the causes of her disability.  (Docket Entry No. 31, Ex. A-2, p. 001).

UNUM, the insurer and Plan administrator, ultimately approved benefits for Adams for

twenty-four months, finding that she met the Plan requirement of having a sickness or injury

that made her unable to perform the "material and substantial duties" of her "regular

occupation" as a systems analyst at Compaq.  After a participant receives twenty-four months

of disability payments, the Plan required a showing of an inability to perform the duties of

"any gainful occupation" for which the participant was "reasonably fitted by education,

training or experience."  After paying benefits for twenty-four months, UNUM terminated

Adams's benefits under the Plan's "any gainful occupation" standard of disability, finding that she was physically and mentally able to perform work requiring sedentary levels of activity on a full-time basis.  (Docket Entry No. 31, Ex. A-2, p. 590).  Adams sued in Texas state court, asserting causes of action under state law for breach of contract, breach of fiduciary duty, and violations of the Texas Insurance Code and Deceptive Trade Practices Act.  Defendants timely removed.  Although Adams amended her complaint, she did not plead that the benefits denial violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.*  Adams nonetheless moved for partial summary judgment that in terminating her long-term disability benefits, UNUM violated ERISA.  (Docket Entry No. 15).  UNUM cross-moved for summary judgment, asserting that, as a matter of law, it did not abuse its discretion in terminating benefits and that the state-law claims are preempted by ERISA.  (Docket Entry No. 31).  Compaq and Hewlett-Packard Company also moved to dismiss the state-law claims against them on the basis of ERISA preemption.[1]  (Docket Entry No. 34).

Based on a careful review of the pleadings; the motions, responses, and replies; the parties' submissions; and the applicable law, this court grants UNUM's motion for summary judgment, finding ERISA preemption of the state-law claims and finding that UNUM did not abuse its discretion in denying Adams disability benefits after 2003; denies Adams's motion for partial summary judgment on the ERISA claim; and grants Compaq's and Hewlett-

---

[1]   Hewlett-Packard acquired Compaq in May 2002, more than two years after Adams became disabled.  The acquisition had no impact on Adams's coverage under the Plan.  (Docket Entry No. 13).  All defendants argue that the state-law claims are preempted.

Packard's motion to dismiss Adams's state-law claims on the basis of ERISA preemption. The reasons for these rulings are stated below.

## I.    ERISA

Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989).  ERISA applies to an employee benefit plan established or maintained by an employer engaged in commerce or in any industry or activity affecting commerce.  29 U.S.C. § 1003(a); *Meredith v. Time Ins. Co.*, 980 F.2d 352, 354 (5th Cir. 1993).  An administrator must act "in accordance with the documents and instruments governing the plan." 29 U.S.C. §§ 1104(a)(1)(D); *see Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) (discussing the various documents that constitute an ERISA plan).  Section 502(a)(1)(B) of ERISA allows a participant in, or beneficiary of, a covered plan to seek judicial review of a denied claim "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B); *MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478 (5th Cir. 2003).

In an ERISA case, the benefit determinations made by a plan administrator can be divided generally into two categories: interpreting the plan terms and determining the facts underlying the benefit claim.  A court reviews a plan administrator's construction of plan terms *de novo* unless the plan contains an express grant of discretionary authority; if so, those decisions are reviewed for abuse of discretion. *Aetna Health*, 542 U.S. at 208 (quoting *Bruch*

489 U.S. at 115).  Three factors are important determining whether the administrator abused its discretion in interpreting plan terms: (1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith.  *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).  A plan administrator's factual determinations are reviewed for abuse of discretion.  *Vercher v. Alexander & Alexander, Inc*., 379 F.3d 222, 226 (5th Cir. 2004).

"When applying the abuse of discretion standard, a court analyzes whether the plan administrator acted arbitrarily or capriciously." *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002).  "An administrator's decision to deny benefits must be based on evidence, even if disputable, that clearly supports the basis for its denial."  *Id*.  A decision is not arbitrary and capricious if it is supported by substantial evidence.  *MediTrust Financial Services Corp. v. Sterling Chemicals, Inc*., 168 F.3d 211, 215 (5th Cir. 1999).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Lain*, 279 F.3d at 342.  A decision is arbitrary when it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence."  *Id.* (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996)).  "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness – even if on the low end."  *MacLachlan*, 350 F.3d at 478 (quoting *Vega v.*

4

*Nat'l Life Ins. Serv. Co.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc)).   If the plan

administrator's decision is "supported by substantial evidence and is not arbitrary or

capricious, it must prevail."   *Ellis*, 394 F.3d at 273.

If a plan administrator has a conflict of interest, courts employ a "sliding scale"

approach.   Under this approach, a court applies the abuse of discretion standard but weighs

any potential conflict of interest in determining whether the administrator abused its

discretion.   *MacLachlan*, 350 F.3d at 478; *Gooden*, 250 F.3d at 333; *Vega*, 188 at 295.   The

greater the evidence of conflict, the less deferential the court's review.   *Vega*, 188 F.3d at

297.   The Fifth Circuit has stated that "[w]hen a minimal basis for a conflict is established,

we review the decision with 'only a *modicum less* deference than we otherwise would.'"

*Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d at 343 (emphasis in original) (quoting *Vega*,

188 F.3d at 301).   In *MacLachlan v. ExxonMobil Corp.,* the court clarified that the fact that

an insurer both administers and determines eligibility for benefits does not by itself establish

a conflict of interest:

> The district court assumed there is a conflict of interest because
> Mobil interprets and administers its own plan, leaving open the
> possibility that it would limit claims to reduce its liability.   The
> court need not have made this assumption.   The mere fact that
> benefit claims are decided by a paid human resources
> administrator who works for the defendant corporation does not,
> without more, suffice to create an inherent conflict of interest.
> Were that enough, there would be a near-presumption of a
> conflict of interest in every case in which an employer both
> offers a plan and pays someone to administer it, making a full
> application of the abuse of discretion standard the exception, not
> the rule.

350 F.3d 472, 479 n.8 (5th Cir. 2003).  Other Fifth Circuit cases state that a court may

conclude that a plan administrator acts under a conflict of interest when the insurer both

determines benefit eligibility and pays the benefits claimed.  *Lain*, 279 F.3d at 343 ("In the

instant case, the district court held that UNUM had an 'inherent conflict of interest' because

it was both the insurer and the plan administrator, which determined whether to pay claims

under the policy."); *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333 (5th

Cir. 2001) (determining that Provident, as plan insurer and administrator "potentially

benefitted from every denied claim").  In *Dubose v. Prudential Insurance Co. of America*,

an unpublished opinion, the Fifth Circuit recognized an apparent conflict of interest when the

insurer was also the plan administrator, but found no error in the district court's deference

to the plan administrator's determination of the insured's eligibility for plan benefits.  85 Fed.

Appx. 371 (5th Cir. 2003).  In *Ellis v. Liberty Life Assurance Co. of Boston*, the court held

that *Vega* did not create a presumption that a "conflict exists *ipso facto*" just because the plan

administrator also insures the plan, but that "an ERISA plaintiff must come forward with

evidence that a conflict exist – and that any reduction in the degree of deference depends on

such evidence. . . ."  394 F.3d 262, 270 n.18 (5th Cir. 2004).

These authorities require an ERISA plaintiff asserting a conflict of interest to come

forward with evidence that a conflict exists.  The reduction in the degree of deference

depends on such evidence.  *See Ellis*, 394 F.3d at 268.  In this case, Adams argues that

UNUM has a conflict of interest, but offers scant evidence to show that UNUM profits from

the denial of her benefits.  With only minimal evidence of a conflicted interest, this court

reviews the Plan administrator's decision with only "a modicum less deference" than abuse of discretion.  *Id.* at 301.[2]

## II.    The Plan Terms

Compaq provided disability benefits to its employees through a plan funded by a group insurance policy UNUM issued in January 1999 (the "Plan"). (Docket Entry No. 31, Ex. A).  The Plan provided for two phases of disability benefits.  During the first phase, an employee is considered disabled if she is unable to perform the duties of her "regular occupation," defined as "the occupation [the participant] is routinely performing when . . . disability begins."  (Docket Entry No. 31, Ex. A, p. 0037).  The second phase begins after twenty-four months of disability payments and requires that the employee be unable to perform *any* "gainful occupation" for which she is "reasonably fitted by education, training or experience." (*Id.,* Ex. A, p. 0020).  Because Adams received benefits for over twenty-four months, the issue is the denial of the benefits under the "any gainful occupation" standard.

A threshold issue is what the Plan terms are.  The record includes a copy of what is characterized as the "Policy," including a Certificate of Coverage UNUM provided to plan participants, a glossary of terms, questions and answers about long-term disability benefits and how to file claims, and a "Summary Plan Description." (Docket Entry No. 31, Ex. A, p. 0005).  The record also includes a 2000 Benefits Guide – which also states that it is "known

---

[2] Adams argues that Dr. Bellino, who reviewed her file during the claims process, has an ownership interest in UNUM and that this conflict of interest warrants heightened review.  Adams does not provide evidence of the asserted conflict.  It is undisputed that other physicians and nurses at UNUM  reviewed her file and reached the same conclusions as Dr. Bellino.  (Docket Entry No. 15).

as a summary plan description" – distributed by Compaq to explain its benefit plans. (Docket Entry No. 15, Ex. A).  Both the Policy and the Benefits Guide  state that the Plan is an ERISA plan and both documents explain ERISA rights.  Adams contends that the terms set out in the Benefits Guide control.  UNUM contends that the terms set out in the Policy control.

Both the Policy and the Benefits Guide make it clear that UNUM has discretionary authority to make benefit determinations.  The Policy states, in the "Certificate Section" issued to the participant, "[w]hen making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."  (Docket Entry No. 31, Ex. A, p. 0014).  The Benefits Guide also makes UNUM's discretionary authority clear.  It explains that UNUM is the claim administrator for both short-term and long-term disability benefits, that Compaq retained the right to review UNUM's short-term disability decisions and established a Benefits Express Review Unit for such appeals, but that UNUM is the plan administrator and final decisionmaker for long-term disability benefits.  The Benefits Guide states that "Long-Term Disability Benefits are insured by UNUM and UNUM makes all determinations of benefits eligibility based on plan provisions and relevant medical and occupational information." (Docket Entry No. 15, Ex. A, p. 10.15).  The Benefits Guide explains that UNUM has discretionary authority to make benefit eligibility determinations, stating as follows:

> The plan administrator has the sole and absolute discretion to construe and interpret any and all provisions of the plans and programs described in this guide, to determine eligibility under

the plans and programs, and to decide all matters of fact in granting or denying benefits claims.

(Docket Entry No.42, Ex. B-1, p. 16.10).

The Policy contains a "glossary" of relevant terms, in bold type, as follows: **LIMITED** means what you cannot or are unable to do.

> **MATERIAL AND SUBSTANTIAL DUTIES** means duties that are normally required for the performance of your regular occupation and cannot be reasonably omitted or modified.
>
> **PART-TIME BASIS** means the ability to work and earn 20% or more of your indexed monthly earnings.
>
> **REGULAR OCCUPATION** means the occupation you are performing when your disability begins. UNUM will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.
>
> **SICKNESS** means an illness or disease. Disability must begin while you are covered under the plan.
>
> **GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work.

(Docket Entry No. 31, Ex. A, pp. 0037–40).

The Policy contains the following definitions of the two phases of "disability":

> You are disabled when UNUM determines that you are:
>
> > **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness or injury**;
> >
> > and you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

9

> After 24 months of payments, you are disabled when UNUM determines that due to the same sickness or injury you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

(Docket Entry No. 31, Ex. A, p. 0020).  Disability payments stop during the first twenty-four months if a participant is able to work part-time in her "regular occupation" but chooses not to, or after the first twenty-four months if a participant is able to work in "any gainful occupation" part-time but chooses not to.  (*Id.*, p. 0025).

The 2000 Benefits Guide defines "disability," as follows:

> You are considered disabled under the plan if your condition prevents you from performing each of the material duties of your regular occupation.  After you have received Long-Term Disability benefits for 24 months, you continue to be considered disabled only if:

> You cannot perform each of the material duties of any gainful occupation that you are reasonably fit to perform by training, education, or experience; or

> You cannot perform all of the material duties of your regular occupation on a full-time basis, but you are:

>> Performing at least one of the material duties of your regular occupation or another occupation on a part-time or full-time basis, and

>> Currently earning at least 20% less per month than your indexed pre-disability earnings.

(Docket Entry No. 15, Ex. A, p. 10.16).

Adams argues that the Benefits Guide definition controls and requires disability benefits when a participant is unable to perform "each" of the material duties of any gainful

10

occupation that the participant is reasonably equipped to hold.  UNUM argues that the Policy

definition controls, which requires that the participant be unable to perform "the duties of any

gainful occupation" for which she is reasonably fitted, and rejects the argument that if a

participant is unable to perform a single duty of such an occupation, she is disabled.[3]

Adams relies on cases holding that if there is a conflict between the summary plan

description and the terms of the plan itself, the summary plan description controls.  *See*

*McCall v. Burlington Northern/Santa Fe Co.*, 237 F.3d 506, 512 (5th Cir. 2000), *cert. denied*,

534 U.S. 822 (2001).  ERISA requires that participants receive a summary plan description

written "in a manner calculated to be understood by the average plan participant, [that] shall

be sufficiently accurate and comprehensive to reasonably apprise such participants . . . of

their rights and obligations under the plan."  29 U.S.C. § 1022(a).  "The summary plan

description is one of the central ERISA disclosure requirements."  *Martinez v. Schlumberger*,

*Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003).  "[C]lear and unambiguous statements in the

summary plan description are binding" on the plan administrator.  *McCall*, 237 F.3d at 511.

"If there is a conflict between the SPD and the terms of the plan itself, the SPD controls."

*Id.* at 512; *see also Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1515 (10th Cir. 1996) ("Because

the SPD best reflects the expectations of the parties to the plan, the terms of the SPD control

---

[3] This argument was not made during the administrative process, but only after litigation.  During the review process, Adams was aware that UNUM was relying on the definition of "disability" contained in the Policy, not the definition in the 2000 Benefits Guide.  UNUM cited the Policy definition of "disability" in its claim correspondence as early as June 8, 2001.  Adams, who was represented by counsel after August 18, 2000, made no argument that UNUM was using the wrong definition.  (Docket Entry No. 31, Ex. A-2, p. 0179).

the terms of the plan itself.").

UNUM has submitted a set of plan documents that it refers to as the "Policy." "Plan documents" are the documents a plan participant could read to determine her rights or obligations under the plan. *See Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) (discussing the various documents that constitute an ERISA plan). "Rules governing collection of premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan." *Id.* The Policy meets this definition; it was clearly addressed to, and intended for, participants such as Adams. UNUM argues that the Benefits Guide cannot control because it explicitly states that it does not do so:

> This Guide, known as a summary plan description, has been prepared to give a brief explanation of both ERISA and non-ERISA benefits and how each benefit plan operates . . .
>
> ***The benefits described in this Guide are subject to the terms and conditions and conditions of the plan documents themselves.  If there is any inconsistency between this summary plan description and any plan documents, the plan document will control.***

(Docket Entry No. 42, Ex. B-1, p. 16. 15) (emphasis in original).

UNUM cites to an unpublished Fifth Circuit opinion, *Gerhold v. Avondale Indus. Inc. Employee Benefit Plan*, 116 Fed. Appx. 497 (5th Cir. 2004), in which the plaintiff argued that the Summary Plan Description was the controlling plan document and granted exclusive discretion to determine eligibility for benefits to the plan administrator, a committee established by his employer, not to the insurer that denied his claim. The district court

rejected the plaintiff's reliance on the SPD because it unambiguously stated that it did not control.  The court stated that:

> The summary plan description relied on by plaintiff is no more than its title suggests: a description in summary form of the plan. At the bottom of the cover page of the summary plan description, in bold, italicized letters, are the words: "The following is only a summary of the Plan. If there is any conflict between the summary and the Plan document, the Plan document controls." The language is unambiguous. By indicating that a conflict could arise between it and the plan, the summary plan description acknowledges that it is not the plan.

*Gerhold v. Avondale Industries, Inc*., 2004 WL 602778 (E.D.La. Mar 23, 2004).  On appeal, the Fifth Circuit affirmed the district court's ruling, explaining that "[t]he Summary Plan Description expressly provides that it is not the plan and that in the event of a conflict, the plan document controls.  This language is clear and unambiguous and establishes that it is not the plan governing eligibility for benefits."  *Gerhold,* 116 Fed. Appx. at 498.

Adams argues that *Gerhold* is inconsistent with *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981–83 (5th Cir. 1991).  In *Hansen,* the Fifth Circuit addressed a conflict between an SPD that had been provided to the plan participants and the insurance policy itself.  The Fifth Circuit held that the "certificate of insurance, which sets out the full terms of the policy, is not part of the summary plan description" and  rejected the plan administrator's reliance on language in the SPD stating that "all rights and benefits will be governed by the Master Policy."  The court explained that to equate the policy with a summary of the policy undermined the purpose of requiring a summary in the first place:

> The very purpose of having a summary description of the policy

> is to enable the average participant in the plan to understand
> readily the general features of the policy, precisely so that the
> average participant need not become expert in [the terms of] the
> policy and its legal terminology.  If a participant has to read and
> understand the policy in order to make use of the summary, then
> the summary is of no use at all.

*Id.* at 982.

This case does not raise the problems identified in *Hansen.*  The concern in *Hansen* was that "the essential purpose of an SPD – 'to enable the average participant in the plan to understand readily the general features of the policy' – would be undermined if workers were held to the *complex, master policy* whenever the statutorily-mandated SPD was either ambiguous or in outright conflict with the policy."  *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 940 (5th Cir. 1993) (emphasis added).  First, what the parties describe as the "Policy" in this case consisted of Plan Documents written for the participant, not the policyholder.  Indeed, the Policy includes documents entitled "Summary Plan Description." The Fifth Circuit has held that "[t]he appropriate test for determining if a document constitutes an SPD under ERISA is to see whether it contains all or substantially all categories of information required under 29 U.S.C. § 1022(b) and the DOL's regulations at 29 C.F.R. § 2520.102-3 for the type of benefit in question."  *Hicks v. Fleming Companies, Inc.,* 961 F.2d 537, 542 (5th Cir. 1992); *see also Cotton v. Mass. Mut. Life Ins. Co.,* 402 F.3d 1267, 1275, n. 8 (11th Cir. 2005).  The Policy contains the required information – the type of administration of the plan; the name, business address and business telephone number of the plan administrator; eligibility requirements for participation and for benefits; a summary

14

explaining the amendment or elimination of benefits under the plan; and a statement of ERISA rights – and meets the criteria for a summary plan description.  29 C.F.R. § 2520.102-3.  Like the summary plan description in *Hansen*, the Policy was written in plain language and targeted to the plan participant.  The "Certificate of Coverage" explains:

> This is your certificate of coverage as long as you are eligible for coverage and become insured.  You will want to read it carefully and keep it in a safe place.
>
> UNUM has written your certificate of coverage in plain English.  However, a few terms and provisions are written as required by insurance law.  If you have any questions about any of the terms and provisions, please consult UNUM's claims paying office.  UNUM will assist you in any way to help you understand your benefits.
>
> If the terms and provisions of the certificate of coverage (issued to you) are different from the policy (issued to the policyholder), the policy will govern.  Your coverage may be cancelled or changed in whole or in part under the terms and provisions of the policy.

(Docket Entry No. 31, Ex. A, p. 0015).  The Policy summarizes the long-term disability benefits in a manner calculated to be understood by the average plan participant.  The different sections – "Benefits at a Glance"; "Certificate of Coverage"; "Benefit Information"; "ERISA"; and "Summary Plan Description"– are drafted for use by a participant and provide answers to such questions as "When are you eligible for coverage?" and "How long must you be disabled before you are eligible to receive benefits?"  (Docket Entry No. 31, Ex. A, pp. 15, 19).  To rely on the Policy language does not displace the summary of benefits provided to the participant with language provided only to the policyholder.

It is also significant that the 2000 Benefits Guide was created by Compaq, Adams's employer, rather than the insurer or plan administrator.   The Benefits Guide, which summarizes all employee programs, not merely the long-term disability benefits plan, is not entitled to the same effect as the Policy prepared by the Plan itself.   "Plans cannot control what miscellaneous recruiters and personnel managers may say. . . . Because ERISA requires plans to prepare summary plan descriptions, and because their content is within the plan's control, it makes sense to give these documents legal effect when relied on. Employer-prepared summaries, by contrast, have no footing in ERISA and could not be enforced against the plan without disregarding the boundary between two distinct entities: the plan and the employer."   *Helfrich v. Carle Clinic Ass'n P.C.,* 328 F.3d 915, 917 (7th Cir. 2003).

Finally, a close reading shows no conflict between the relevant language in the Benefits Guide and in the Policy, either in the grant of discretion or in the definition of "disability."   Both sets of documents provide that UNUM has discretion to interpret the Plan terms and to determine benefit eligibility.   Chapter 10 of the 2000 Benefits Guide states: "[y]ou can receive Long-Term Disability payments only while you meet the plan's definition of disability and your disability continues to be approved by UNUM" and "UNUM makes all determinations of benefits eligibility based on plan provisions and relevant medical and occupational information."   (Docket Entry No. 15, Ex. A, p. 10.15).   Adams argues that this language is insufficient for abuse of discretion review.   As UNUM points out, Adams cites only to Chapter 10 of the Benefits Guide.   Chapter 16, titled Administrative Information,

discusses the discretionary authority of UNUM, and must be considered as well.  *See McCall,*

237 F.3d at 512 ("[T]he SPD must be read as a whole.  It would be error to attend only to one

paragraph, page, or portion of the summary.") (citations omitted); *see also Cagle v. Brunder,*

112 F.3d 1510, 1517 (11th Cir. 1997) (per curiam) ("we look to all of the plan documents to

determine whether the plan affords the Fund enough discretion to make the arbitrariness

standard applicable").  Chapter 16 of the Benefit Guide states:

> With the exception of plans or programs that provide benefits
> through insurance contracts, the plan administrator has the sole
> and absolute discretion to construe and interpret any and all
> provisions of the plans and programs described in this Guide, to
> determine eligibility under the plans and programs, and to
> decide all matters of fact in granting or denying benefits claims,
> including but not limited to, the discretion to resolve
> conclusively ambiguities, inconsistencies, or omissions. . . .

(Docket Entry No. 42, Ex. B-1, p. 16.7).  For Plan benefits provided through insurance

contracts, the authority to "construe and interpret any and all provisions of the plans" and "to

decide all matters of fact in granting or denying benefit claims" reside with the insurer,

except that the Plan administrator continues to have the absolute discretion "to determine

eligibility under the terms of the plans or programs."  (*Id.,* p. 16. 7).  In subsequent pages,

UNUM is identified as the Plan administrator for the Long-Term Disability Plan.   In

describing the appeals process, the Benefits Guide also states that for long-term disability

benefit determinations, UNUM's determination is final.  (*Id.,* p. 16.8).  This court rejects

Adams's argument that *de novo* review applies because Chapter 10 of the 2000 Benefits

Guide did not give UNUM the express discretionary authority to make benefit

17

determinations.

The Policy is consistent.  It states that: "[w]hen making a benefit determination under the policy UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."  (Docket Entry No. 31, Ex. A, p. 014). The Policy and Chapter 16 of the 2000 Benefits Guide provide that UNUM has discretionary authority to make benefits determinations.  The abuse of discretion standard applies under either document.

Adams argues that the definitions of "disability" in the Policy and the Benefits Guide are inconsistent.  The Policy defines "disability" after twenty-four months of payments as the inability "to perform the duties of any gainful occupation" for which the participant is reasonably fitted.  The Policy also states that  disability payments stop after the first twenty-four months if a participant is able to work in "any gainful occupation" part-time, but chooses not to.  (Docket Entry No. 31, Ex. A, p. 0025).  The Benefits Guide defines "disability" after twenty-four months of payments as an inability to perform "each of the material duties of any gainful occupation" for which the participant is reasonably fitted, or an inability to "perform all of the material duties of [the participant's] regular occupation on a full-time basis," but the participant is able to perform "at least one of the material duties of [the] regular occupation or another occupation on a part-time or full-time basis," but at a defined reduction in earnings.  (Docket Entry No. 15, Ex. A, p. 10.16).  The latter part of this provision, addressing partial disability, is a different way of explaining what is also set out in the Policy: a participant may receive disability payments if she is able to work part-time

18

performing all the material duties of her regular occupation or part-time or full-time performing "at least one of the material duties" of her regular occupation or any gainful occupation, but may not receive such payments if she is able to perform such part-time work but chooses not to.

Adams argues that under the Benefits Guide definition, "the legally correct interpretation . . . is that one is 'disabled,' if there is a single material duty of any occupation she cannot perform." (Docket Entry No. 15, p. 19). Adams draws her argument from the word "each" in the Benefits Guide definition of "disability" as the inability to perform "each of the material duties of any gainful occupation." UNUM cites the Policy definition – inability to perform "the duties of any gainful occupation" – and argues that under the plain meaning of the provisions and the applicable case law, disability does not mean an inability to perform a single material duty of the any occupation for which a participant is suited.

A court uses a two-step analysis in determining whether a plan administrator abused its discretion in construing plan terms. *Rhorer v. Raytheon Eng'rs and Const'rs, Inc.*, 181 F.3d 634, 639 (5th Cir. 1999). The court first determines the legally correct interpretation of the plan and whether the administrator's interpretation accords with the proper legal interpretation. *Id*. If the administrator's construction is legally sound, then no abuse of discretion occurred and the inquiry ends. *Id.* at 639-40. If the court concludes that the administrator has not given the plan the legally correct interpretation, the court must then determine whether the administrator's interpretation constitutes an abuse of discretion. *Id*. at 640. In order to ascertain the legally correct interpretation of the plan, a court considers:

"(1) whether a uniform construction of the [plan] has been given by the administrator; (2) whether the interpretation is fair and reasonable; and (3) whether unanticipated costs will result from a different interpretation of the policy." *Lain v. UNUM Life Ins. Co. of America*, 279 F.3d at 344. Adams has not alleged that there was an inconsistent construction of the Plan or that there were unanticipated costs. The inquiry is whether UNUM's interpretation of the Plan was fair and reasonable. *Vercher v. Alexander & Alexander Inc.,* 379 F.3d at 227-228.

Eligibility for benefits under an ERISA plan is "governed in the first instance by the plain meaning of the plan language." *Threadgill v. Prudential Securities Group, Inc*., 145 F.3d 286, 292 (5th Cir. 1998). The court interprets ERISA plans in "an ordinary and popular sense as would a person of average intelligence and experience." *Jones v. Georgia Pacific Corp*., 90 F.3d 114, 116 (5th Cir. 1996) (internal quotation and citation omitted). "Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of contra proferentum and construe the terms strictly in favor of the insured." *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997) (citation omitted).

Courts in this circuit have analyzed similar plan terms, although each has differences that must be examined, and the cases address disability from "regular occupation" more than from "any gainful occupation." In *Vercher v. Alexander & Alexander*, the court considered a policy that defined disability as the inability to "perform any and every duty of your regular occupation." The court rejected the district court's definition of "completely unable to

20

work," finding that it "goes too far."  The court emphasized that the legally correct definition applied by the insurer was that "if there were something [the participant] was unable . . . to do that was indispensable or essential to the proper performance of her regular occupation, she would have received benefits.  However, so long as she was able to perform all the substantial and important aspects of her job, . . . and any aspects of the job that she could not perform . . . were, singly or together, not indispensable or essential to the job, then she was not disabled."  379 F.3d at 231.  The court drew on the decision in *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211 (Tex. 2003).  In that case, the Texas Supreme Court held that a definition of "total disability" as "unable to perform the duties of your occupation," was permissibly read to mean that a person is disabled when he is "unable to perform all of the important duties of his occupation."  In that case, the plaintiff was not totally disabled because he could perform "some of his duties."  *Id.* at 216-17.

The Policy definition – unable to perform the duties of any gainful occupation for which the participant is reasonably suited – is consistent with UNUM's interpretation that disability requires more than an inability to perform one or even some of the duties of any gainful occupation. *See Vercher*, 379 F.3d at 27; *Knott*, 128 S.W.3d at 216-17.  Adams relies on the Benefits Guide definition – "the inability to perform "each of the material duties of any gainful occupation" – and argues that it means that a participant is disabled if she is unable to perform a single material duty of any gainful occupation for which she is reasonably fitted.  Adams's argument ignores the language in the Benefits Guide defining a disability after twenty-four months as *either* the inability to perform "*each of* the material

21

duties of any gainful occupation" *or* the inability to perform all of the material duties of the participant's regular occupation on a full-time basis, but the participant is performing at least *one of the material duties of the regular occupation or another occupation* on a part-time or full-time basis, but earning at least 20% less per month than the indexed predisability earnings. An inability to perform each of the material duties of a gainful occupation cannot mean an inability to perform a single duty. "Each" duty cannot mean the same as "one of the material duties," without ignoring the distinctions between the two alternative grounds for disability after twenty-four months of payments. If, instead, the inability to perform "each" material duty of any gainful occupation means that the participant is unable to perform all the substantive and indispensable aspects of a job for which she is reasonably suited, the provisions are consistent. *See Vercher*, 379 F.3d at 27; *Knott*, 128 S.W.3d at 216-217; *Ellis,* 394 F.3d at 272-73. This reading also makes it clear that the Benefits Guide that Adams quotes is consistent with the Policy definition of disability on which UNUM relies.

Adams relies on *Lain*, in which the court read a provision containing the words "each of" in the insurance policy's disability provision to mean that "an insured must be unable to perform only a single material duty of her occupation" in order to be disabled. 279 F.3d at 345. In *Lain*, unlike the present case, that was the interpretation the insurance company gave in its first level review of the claim. In addition, the insurance company had "previously interpreted the policy in other cases containing a similar definition of 'disability' as requiring a person to be unable to perform only a single material duty of her regular occupation." *Id.* And, as the court noted in *Vercher, Lain* looked to Texas law, which was changed when the

22

Supreme Court handed down *Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, which appears to give a somewhat more restricted meaning to a policy's total disability definition.  In *Knott*, the court supported its analysis by the difference between the provisions for "total disability" ("unable to perform the duties of your occupation") and "partial disability" (unable to perform one or more of [his] important daily business duties, or . . . [his] usual daily business duties for at least one-half of the time usually required. . . ."  128 S.W.3d at 216-17.  The same distinction is present here and supports UNUM's construction.

Adams's argument is also inconsistent with the stricter standard of disability that applies under the "any gainful occupation" standard as compared to the "regular occupation" definition.  A participant who qualifies for benefits during the first twenty-four months of disability may not be entitled to long-term benefits if she is able to perform the duties of another occupation for which she is reasonably suited.  *See Kobs v. United Wis. Ins. Co.,* 400 F.3d 1036 (7th Cir. 2005) (rejecting argument that "any occupation" definition of disability was "nearly identical" to "own position" definition and holding it was not arbitrary and capricious for administrator to interpret the Plan in a way that granted a participant benefits under the latter definition only).

This court concludes that the Policy language controls (although it is not inconsistent with the Benefits Guide language) and that UNUM did not adopt a legally incorrect definition of disability.

## III.    The Record as to Adams's Claim

### A.    Disability Payments for the First Twenty-Four Months

From 1991 to 2000, Adams worked as a Senior System Analyst for Compaq. According to Compaq's job requirement form, Adams's duties as a System Analyst were project management, business analysis, application design, and development work. The position required Adams to sit for six to seven hours daily and frequently use her hands for typing on a computer keyboard and controlling a mouse. The position required the "basic capability to use e-mail." The position did not require that Adams travel or drive, stand, walk, climb stairs, operate machinery, or carry or lift objects. Part-time work was available for the position and some of the job responsibilities could be altered to accommodate functional limitations. (Docket Entry No. 31, Ex. A-2, pp. 074-77).

Adams was diagnosed with fibromyalgia in 1997. She also suffered from depression and had a history of carpal tunnel syndrome. The medical records show that in 1994, Adams was diagnosed with mild bilateral carpal tunnel syndrome and chronic left shoulder impingement. In the spring of 1994, Dr. Andrew Kant, an orthopedic surgeon, performed a carpal ligament release on Adams's left wrist and arthoscopic decompression of her left shoulder. In December 1994, Dr. Kant performed a carpal tunnel release on Adams's right wrist. Dr. Kant's office notes indicate that Adams experienced a "little pain" along the scar in her left wrist, but that her circulation and power were intact. (Docket Entry No. 31, Ex. A-2, p. 0041). In March 1995, Dr. Kant prepared an impairment rating at Adams's request, finding that she had reached "maximum medical improvement" with an 11% impairment of the upper left extremity and a 3% impairment of the right upper extremity. (*Id.,* pp. 0051-55). In March 1995, after the wrist and shoulder surgeries, Adams returned to her position

at Compaq, where she worked for another five years.

In 1997, Dr. Kant saw Adams again for pain in her hands and left shoulder, stiffness, tender points in muscles, generalized muscle weakness, and excessive fatigue.  Dr. Kant administered tests and found no sign of recurrent carpal tunnel syndrome, peripheral neuropathy, or cervical radiculopathy.  Office notes from Dr. Ramzy, a neurologist who examined Adams in September 1999, described as "unremarkable" test results of Adams's upper extremities.  MRI and EMG tests showed no evidence of recurrent carpal tunnel syndrome, peripheral neuropathy, or cervical radiculopathy.[4]  The cervical spine MRI showed no disc abnormalities.  A lumbar spine MRI showed early degenerative changes of nerve root irritation in two discs.  A physical examination showed: "Cranial nerve examination is normal.  Neck is supple. . . . There is no evidence of focal motor deficit [or sensory] deficit.  There appears to be mild generalized muscle tenderness.  No evidence of muscle atrophy."  Dr. Ramzy noted that the cause of the "generalized numbness and aching" was unclear and the presence and history of fibromyalgia were "questionable."  (*Id.,* pp. 0056-67; 0473).

On January 20, 2000, Adams filed a claim for short-term disability benefits listing fibromyalgia as the cause of her inability to work.  Fibromyalgia is a rheumatic disorder characterized by chronic pain, tenderness, and stiffness of muscles, tendons, and ligaments,

---

[4] Peripheral neuropathy refers to a diseased or degenerative state of the peripheral nerves in which motor, sensory, or vasomotor nerve fibers may be affected.  The condition is marked by muscle weakness and atrophy, pain, and numbness.  Cervical radiculopathy generally refers to a pathological condition of the nerve roots in the neck.  Merriam-Webster Medical Dictionary, available at: http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last visited June 24, 2005).

without detectable inflammation.[5]  It is characterized by diffuse pain, tenderness, stiffness of joints, fatigue, cognitive and memory problems, and disturbed sleep.  The American College of Rheumatology criteria for clinical diagnosis require "a history of a least three months of widespread pain, and pain and tenderness in at least 11 of 18 tender-point sites. These tender-point sites include fibrous tissue or muscles of the neck, shoulder, chest, rib cage, lower back, thighs, knees, arms (elbows), and buttocks.  "Tender points" are distinct from "trigger points" in other pain syndromes.  Unlike "tender points," "trigger points" occur in isolation and can cause  pain even without direct pressure.[6]  The cause of fibromyalgia is unknown, there is no cure, and there are currently no objective laboratory tests for its presence or severity.  *See Neumann v. Prudential Ins. Co. of America,* 367 F.Supp.2d 969, 982 (E.D. Va. 2005) (collecting authorities).[7]  Fibromyalgia  "can interfere with a person's ability to carry on daily activities. . . . And while some people may have such a severe case of fibromyalgia as to be totally disabled from working, most do not."  *Id.* (citations omitted).

UNUM asked for additional medical records, particularly office notes and laboratory reports, and telephoned Adams to discuss her claim.  Adams told the UNUM claims manager that she had suffered from carpal tunnel syndrome since 1994 and had a bilateral carpal

---

[5]    Merriam-Webster  Medical  Dictionary,  available  at:  http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last visited June 24, 2005).

[6]    Merriam-Webster  Medical  Encyclopedia,  available  at:  http://www.nlm.nih.gov/medlineplus/encyclopedia.html.

[7]    *Neumann*, 367 F.Supp.2d at 982, citing Wolfe, *et al.*, "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia:  Report of the Multicenter Criteria Committee, 33 *Arthritis & Rheumatism* 160-72 (1990).

tunnel release in 1995, and that she had suffered from fibromyalgia since 1997.  Adams

related that she experienced pain in her hands and feet, body aches, sleep problems, pain and

stiffness in her extremities, and depression.  She reported that she could not sit for more than

one hour at a time.  She also stated that she was able to drive, do grocery shopping, and clean

house, but explained that her daughter helped her carry grocery bags and with cleaning

chores.  Adams stated that the pain in her hands and wrists made her unable to use a pen or

pencil or a keyboard for prolonged periods.  She did not think she would be able to perform

the normal tasks of her job again.  (*Id.*, pp. 0005, 0139).

Adams identified Dr. Ali, a rheumatologist, as the physician who had treated her for

fibromyalgia since 1997.  An Attending Physician's Statement dated January 31, 2000 from

Dr. Ali stated in relevant part as follows:

> Melodie Adams is my patient for fibromyalgia.  She has been
> unable to function because of her severe pain and stiffness
> involving both upper and lower extremity muscles.  At present
> she is taking Celexa 30 mg a day and Ambien 10 mg at night.
> She is also doing physical therapy in the office.  I first saw her
> in September 1997 and at that time she was complaining of pain
> and stiffness along with insomnia, tender points in muscles,
> generalized muscle weakness, and excessive fatigue.  She has
> never had any kind of surgery on any of the joints, and I don't
> expect surgery to be performed in the future. . . . Her condition
> is not because of injury or sickness arising out of patient's
> employment. . . . The overall prognosis is guarded.

(Docket Entry No. 31, Ex. A-2, p. 0004).

In February 2000, Adams saw Dr. Rubin, a rheumatologist, who performed an ANA

blood test and physically examined Adams.[8]  As described in his office notes, Dr. Rubin found that Adams "meets the ACR criteria for fibromyalgia" and also diagnosed hypothyroidism.[9]  He prescribed Vioxx for pain and inflammation and Synthroid for the thyroid condition.  During a follow-up examination, Dr. Rubin noted that the Vioxx "really helped," but that Adams was not exercising, had gained weight, and was depressed and anxious about her disability claim.  (*Id.*, pp. 0159-70).

Eleanor Dudek, a UNUM nurse, reviewed Adams's file and found that her treating physicians supported her claim of impairment from fibromyalgia.  (*Id.* at pp. 0116-17).  Dudek noted that reasonable restrictions could include frequent rest periods, no prolonged sitting, standing, or walking, no lifting, carrying, pushing or pulling, no squatting or bending, no repetitive motions, and no exposure to extreme heat or cold.  UNUM sent Adams a letter dated February 22, 2000, stating that her claim for short-term benefits had been approved through March 8, 2000 and asking for  a list of activities that Adams "could not perform for medical reasons and why."   UNUM also provided a Functional Capacities Evaluation

---

[8]   An ANA test is a blood test that measures the presence of antinuclear antibodies.  Antinuclear antibodies attack the body's own tissues instead of foreign toxins and are often present in people with autoimmune diseases including thyroid disorders, lupus erythematosus, multiple sclerosis, rheumatoid arthritis, and type 1 diabetes. Merriam-Webster Medical Encyclopedia, available at: http://www.nlm.nih.gov/medlineplus/encyclopedia.html (last visited June 24, 2005).

[9]   Hypothyroidism is a condition in which the thyroid gland fails to produce thyroxine and triiodothyronine, two hormones that control metabolism.  This underactivity of the thyroid gland may cause a variety of symptoms.  "The body's normal rate of functioning slows, causing mental and physical sluggishness."  The symptoms may vary from mild to severe and commonly include cold intolerance, weakness, depression, constipation, thinning of the hair and nails, and unintentional weight gain.  Additional symptoms include muscle atrophy, muscle spasms, uncoordinated movement, overall swelling, hair loss, and absence of menstruation.  Merriam-Webster Medical Encyclopedia, available at: http://www.nlm.nih.gov/medlineplus/encyclopedia.html (last visited June 24, 2005).

("FCE") form for Dr. Ali to complete.  The letter explained that a "note from your physician saying you cannot return to work will not be acceptable without the supporting medical data." (*Id.,* p. 0134).

On March 8, 2000, UNUM contacted Adams and stated that it had not received the information previously requested.  Dr. Ali had sent UNUM copies of certain medical records, but had not completed the FCE form.  Dr. Ali referred Adams to Paul Sison, a physical therapist, who conducted a three-hour examination on March 9, 2000 and completed an FCE report.  The report listed bilateral carpal tunnel release, fibromyalgia, and depression as the medical conditions; described Adams's job as requiring a "Light-Medium Physical Demand Level"; and concluded that her functional capacity was limited to a "Sedentary Physical Demand Level."[10]  The FCE stated that the Systems Analyst position required Adams:

> to use her hands doing simple grasping and typing/key punching activities constantly; doing firm grasping, fine grasping, precision work, speed work and twisting activities frequently. She is also required to do occasional stooping, bending and lifting activities up to 30 lbs; frequent forward reaching and twisting activities.

---

[10]  The FCE report stated that it relied on the Department of Labor's Dictionary of Occupational Titles ("DOT").  The DOT defines "Sedentary Work" as "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."  "Light Work" is defined as "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly ([c]onstantly: activity or condition exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work."  "Medium Work" means "[e]xerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work." U.S. Dept. of Labor, Office of Administrative Law Judges, Dictionary of Occupational Titles, Appendix C, available at http://www.oalj.dol.gov/public/dot/REFRNC/DOTAPPC.HTM (last visited Aug. 01, 2005).

(*Id.,* p. 0136).  The report described Adams's "Material Handling Activities" as the ability to lift, push, and carry up to 10 pounds occasionally (1 to 32 times a day).  With respect to "Non-Material Handling Activities," the FCE report stated that Adams was able to sit and walk frequently for up to two-thirds of the day and stand, bend, reach, and perform repetitive leg/arm movements occasionally for up to one-third of the day, but could never crawl.  (*Id.,* pp. 0136-38).   The FCE report described the following functional limitations and assessments:

> [Hand Functions] Restricted to the following activities:
>
> 1.)  Occasional Low Speed Activity
> 2.)  Occasional Light Grasping/Gripping
> 3.)  No frequent hand activity
>
> ASSESSMENT and RESULTS:
>
> Job Physical Demand Level:   Light-Medium
> Patient Functional Level:       Sedentary
>
> ASSESSMENT/PROBLEM LIST:
>
> 1.)   There is weakness in bilateral hand grip strength with weakness of the extrinsic muscles of the forearm, wrist and hand.
>
> 2.)   There is decreased range of motion for both wrists with tight soft tissues particularly the ligaments and the joint structures.
>
> 3.)   There are subcutaneous minimal scar tissue adhesions over the wrist area restricting range of motion.
>
> 4.)   Decreased ability / tolerance to doing reaching, grasping, gripping, fine motor and assembly type of hand activities.

30

RECOMMENDATIONS:

1.)     The patient is still unable to meet the physical demand requirements of her job description because of the constant repetitive nature of her job as a System Analyst for Compaq.

2.)     She is only able to function at Sedentary Physical Demand Level able to lift up to 10 lbs occasionally, negligible weight frequently and negligible weight constantly.

3.)     Body Mechanics, Joint Conservation Techniques and Ergonomics Instruction.[11]

4.)     The patient may also benefit from rehabilitation to increase soft tissue mobility, increase ROM, decrease pain, increase strength and increase endurance.

(*Id.,* p. 0138).

On March 21, 2000, UNUM contacted Adams, who reported that she could not use the keyboard due to carpal tunnel syndrome that she previously had.  Adams stated that Dr. Ali and Dr. Rubin had encouraged exercise and that she was able to use the treadmill at a slow pace and for a short period of time.  (*Id.,* p.0139).  UNUM nurse Anne O'Brien reviewed Adams's claim and concluded that the medical information submitted did not support a finding of disability from her regular job.  O'Brien noted that Dr. Ali encouraged Adams to increase exercise and did not state that she would have ongoing impairment, that Dr. Rubin had found improvement with respect to Adams's arthritis complaints, and that Dr.

---

[11]  Ergonomics refers to the arrangement and design of work-place equipment to prevent injuries. Ergonomic principles are often advocated as a means to reduce repetitive motion disorders or injuries that result from repeated motions performed in the course of normal work, such as carpal tunnel syndrome, bursitis, tendinitis, epicondylitis, ganglion cyst, and tenosynovitis. Office of Health and Safety, Centers for Disease Control and Prevention, available at http://www.cdc.gov/od/ohs/manual/ofcsfty.htm.

Brown's records showed normal test results for carpal tunnel syndrome.  Finally, the March

9, 2000 FCE report described an ability to perform at a sedentary level of activity, with

restrictions on the use of the hands.  O'Brien noted that Compaq had stated that it could

modify the duties of Adams's position to include part-time work for endurance purposes and

could make other accommodations to her daily tasks.  O'Brien noted possible

accommodations:  "[t]he usual restrictions and limitations with her hands are the ability to

self pace and vary her repetitive hand activities.  She could write with a 'wide/fat' pen to

decrease fine pinch/grip movements, she could dictate some of her typing activities."  (*Id.,*

p. 0176).

On May 23, 2000, UNUM denied Adams's disability claim on the basis that the

medical evidence indicated that she was able to perform sedentary work.  The denial letter

stated:

> Review of office notices from Dr. Brown . . . reflect that you
> were able to perform sedentary activities with restrictions of no
> heavy lifting, use of hands is restricted to occasional, low speed
> assembly, occasional light grasping/gripping.  The [test] results
> . . . show normal limits and no signs of Carpal Tunnel
> Syndrome, peripheral neuropathy and myopathy or cervical
> radiculopathy.
> As of 3/17/00 Dr. Rubin indicates improvement from an
> Arthritic stand point, [the office notes] reflect[] more energy
> with less pain.
>
> In March you have reported your Activities of Daily Living to
> be as follows: sit up to 45 minutes to 1 hour, you are unable to
> write with a pen, you are able to do dishes, grocery shopping,
> use of the treadmill, and you are able to care for your dog and
> puppies.  You have also noticed that you have assistance with
> these activities from your daughter.

> Based on the current information in your file, continued impairment from sedentary, light work is not supported by the unremarkable exams [and] the FCE which shows ability to perform sedentary activities.

(Docket Entry No. 31, Ex. A-2, p. 0181).

Adams appealed UNUM's decision and submitted additional medical records. These records included all the documents she had previously provided, as well as office visit notes from Dr. Archer Tullidge, a psychiatrist who saw Adams for depression in 1999, and Dr. Larry Pollock, who performed a neuropsychological evaluation on Adams in June 2000. Dr. Tullidge's office notes stated that Adams was experiencing a decrease in energy and motivation, anhedonia, and increased tearfulness.[12]  Dr. Tullidge diagnosed Adams with major depression and prescribed antidepressant medication and Ambien for sleep.  In June 2000, Dr. Pollock diagnosed organic brain syndrome and major depressive disorder, concluding that "Adams is unable to participate in competitive employment due to her combination of chronic physical pain, Major Depression, and neurocognitive impairments in memory."  Dr. Pollock's June 10, 2000 report stated in part as follows:

> BACKGROUND:
>
> [Adams] was referred for a neuropsychological evaluation in order to determine current levels of cognitive and emotional functioning.  [Adams] has a long history of physical difficulties, including Fibromyalgia, Carpal Tunnel Syndrome, thyroid difficulties and depression.  She indicated that she recently noticed difficulties with memory, attention, and confusion. . . .

---

[12]  Anhedonia refers to the inability to gain pleasure from normally pleasurable experiences. Merriam-Webster Medical Dictionary, available at: http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last visited June 24, 2005).

At present, [Adams] is taking the following medications: Synthroid for her thyroid problems, Celexa for depression and pain, Vioxx for pain and inflammation, Premarin for hormone therapy, Flexeril for muscle pain, Darvocet for pain, Ambien for sleep, and Flurosemide for water retention . . . [Adams] described herself as having Chronic Fatigue Immunodeficiency Syndrome (CFIDS) and Myofacial Pain Syndrome (MPS). . . .

[Adams] is widowed and currently lives by herself.   She indicated that her husband died of cancer in December of 1998 and that her mother died of emphysema in August of 1999. . . .

TEST RESULTS
. . .

Memory:  [Adams] was oriented to person, place, time, and purpose.  Rote verbal learning of a list of unrelated words was low average to mildly deficient, and moderately deficient after a 30-minute delay.  Logical verbal memory involving the recall of short prose passages was low average for immediate recall and remained low average after a 30-minute delay.  Copy of a complex geometric figure was average.   Immediate visual reproduction of the same design from memory was high average and remained average after a 30-minute delay.   Continuous visual recognition was severely deficient.
. . .

Executive:   Assessment of executive functioning revealed average to superior performance.   Auditory information processing speed appeared to be average to high average. Nonverbal deductive reasoning involving hypothesis generation, planning, organization, and response to oral feedback was within normal limits.  Speed of visual tracking was high average and superior when a cognitive flexibility component was added.

Personality:  Personality assessment indicated that [Adams] is currently experiencing significant emotional and psychological distress [and] feels very overwhelmed and uncertain as to what will happen in her future.  She has had to deal with numerous physical difficulties, an inability to work, as well as the deaths of her husband and mother.  This has left [Adams] feeling very

34

> depressed and sad.  She has noted an increase in crying, and a
> decrease in energy and ability to sleep.  [Her] current emotional
> functioning may vacillate from feeling sad and down to feeling
> tense and irritable.  The circumstances over the last few years
> have left [Adams] very discouraged and frustrated, particularly
> since being denied disability benefits. . . .

(Docket Entry No. 31, Ex. A-2, pp. 0183-88).

During the appeals process, UNUM separately reviewed Adams's claim of disability

based on depression and cognitive deficiencies.  UNUM's Psychology Department requested

the raw data from Adams's neuropsychological exam and arranged for Dr. Jay, a psychiatrist,

to review the data.  (*Id.,* p. 0374).  Dr. Jay found that the data did not support a finding of

disability or a diagnosis of organic brain syndrome associated with fibromyalgia.  Dr. Jay's

report stated in part as follows:

> Dr. Pollock did not discuss attribution regarding his diagnosis of
> 'organic brain syndrome.'  He did not discuss the possibility of
> medication effects either, even though [Adams] took multiple
> medications with psychoactive properties.  He also did not
> discuss the possible effects of depression upon cognition, even
> though he had an impression of major depressive disorder of
> moderate severity.  He further did not discuss the possibilities of
> cognitive effects due to a psychosomatic process, even though
> the [] profile showed a prominent 'conversion V.'

(*Id.,* pp. 0375-80).

On February 27, 2001, Adams's claim was denied.  The denial letter focused on Dr.

Jay's opinion of Dr. Pollock's analysis:

> [C]ognitive slowing was not evident.  The WAIS-R digit symbol
> subtest showed an age-corrected finding of 9, a centrally
> average finding.  In addition, Dr. Pollock noted that other
> findings in visual processing speed were high average to

35

> superior.  [UNUM thought] these findings collectively argued
> against a diffuse encephalopathic process such as has been
> purported to accompany selected cases of fibromyalgia.
> Moreover, the World Health Organization has indicated that
> block design construction has appeared to be sensitive to the
> encephalophathy associated with fibromyalgia.  Yet in this case,
> an age-correlated score of 13 was seen on block design, a high
> average finding.

(*Id.* at p. 0384).

Adams appealed again.  Her file was sent to the Quality Performance Support Unit for review.  In a letter dated March 6, 2001 sent in support of the appeal, Adams's lawyer called UNUM's "attention especially" to Dr. Pollock's evaluation, arguing that it "clearly shows a continuing deterioration in Mrs. Adams's condition that makes a return to work impossible."  (*Id.,* pp.0385-86).

Michael Marley, a Senior Appeals Specialist, was assigned to the claim.  After reviewing the file, Marley found that Adams's physical impairments needed further attention.  Marley asked Dr. Francis Bellino, M.D. to review Adams's file.  Marley noted that the claim had been reviewed by Dr. Jay and that the "psych/cognitive issues" were adequately addressed.  "However, no OSP review was ever done regarding the claimant's alleged physical problems.  [P]lease note that an FCE was done on 3/9/00 which concluded the claimant could not perform her job due to physical problems."  (*Id.,* p. 0393-94).

Dr. Bellino reviewed the medical records relating to Adams's physical conditions of fibromyalgia and chronic pain and the history of carpal tunnel syndrome and shoulder impingement.  Dr. Bellino concluded that the clinical evidence did not give a clear picture

36

of disability due to fibromyalgia and noted that the shoulder impingement and carpal tunnel

syndrome had been treated successfully.  Although the March 2000 FCE report concluded

that Adams had restrictions and limitations, including on repetitive or frequent hand

movements, the report also indicated that Adams could perform sedentary activity for up to

two-thirds of the day and could stand, bend, reach forward and overhead, and climb for up

to one-third of the day.  As to the fibromyalgia and related limitations, Dr. Bellino stated:

> Her criteria for fibromyalgia are not specified at any point in the
> records by Dr. Rubin or Dr. Ali.  Both indicate tender points.
> Dr. Ali indicates only the words "tender points" with no
> specification of number or location.  Dr. Rubin indicates the
> tender points on a figure of the human body.  However, due to
> photocopying resolution, I can only see four or perhaps six
> points.  Therefore, I cannot judge whether the claimant meets
> even the tender point criteria of the fibromyalgia label.
> However, she does have some of the features including the
> diffuse tenderness which appears to occur in the upper and
> lower body, which would be consistent with the chronic
> fibromyalgia. . . .

> The claimant's evaluation by *Functional Capacity Examination in 3/00* gave
> her the following functionality.  She is able to lift, carry, push, and pull ten
> pounds.  She was able to sit up to 66 percent of the day.  She is able to stand
> up to 33 percent of the day and walk up to 66 percent of the day.  She is able
> to bend, reach forward and above head, and climb 33 percent of the day . . .
> She has restrictions on her hands of occasional low speed assembly and
> occasional light grip and no frequent hand activities.  This was done with
> validation of 13 out of 13 items passed.  The examiner opined that her job was
> medium or light and, therefore, opined that she was unable to do that.  *(It is not
> clear to me what level the rehabilitation counselors here are giving this
> occupation and whether she is unable to functionally participate in it*).

(*Id.,* p. 0397) (emphasis in original).  Dr. Bellino found it significant that Dr. Ali, who was

treating Adams at the time of her removal from the workforce in January 2000, did not

specifically indicate a particular impairment.  Dr. Ali had been treating Adams since 1997,

three years before she stopped working and sought disability benefits.  In January 2000, Dr.

Ali had described her status as "unchanged."  Dr. Bellino concluded that it appeared that

Adams had been working for several years with the same symptoms and functional capacities

that she now claimed to support disability.  Dr. Bellino noted that Dr. Rubin had recorded

Adams's concern that Dr. Ali did not think that she was disabled.  In his conclusion, Dr.

Bellino stated that the "Claimant's Restrictions and Limitations are based solely on her self-

reported symptoms that have been labeled as fibromyalgia.  There is no identified underlying

physiologic explanation for her complaints."  He also noted that Adams had been

noncompliant with her treatment regime.  (*Id.,* pp. 0396-98).

On May 7, 2001, Richard Byard, a vocational consultant, reviewed the FCE

completed by Sison.  Byard noted that the Compaq Systems analyst position was a sedentary

occupation requiring frequent keyboarding and typing.  Based on the "frequent hand activity"

limitation found in the FCE report, Byard concluded that the FCE supported the conclusion

that Adams could not perform all the material tasks of her regular occupation.  Byard noted

that the other restrictions in the FCE report would not prevent her from performing the tasks

required by her regular occupation.  (*Id.,* p. 0399).

On June 8, 2001, UNUM sent Adams's counsel a letter explaining that it was sending

her file to the Portland field benefits office for further investigation and for updated medical

records.  The claims manager noted that UNUM did not have any medical records after July

2000.  (*Id.,* p. 0400).  On November 7, 2001, Adams's new counsel sent UNUM updated

medical records and a demand letter, asserting that her claim for disability benefits had been

wrongfully denied.  The letter stated:

> The medical evidence . . . unequivocally substantiates that Ms.
> Adams's bilateral hand grip strength weakness, and decreased
> ability to do reaching, grasping, gripping, and fine motor and
> assembly type hand activities, along with her chronic physical
> pain, major depression, and neurocognitive impairments,
> absolutely precludes her ability to perform each of the material
> and substantial duties of her occupation or any other occupation
> her employer may offer.

(*Id.,* pp. 0402-09).  Adams also submitted the records from a "fully favorable" disability

determination by the Social Security Administration in August 2001.  The records show that

Adams filed a claim for disability benefits on June 15, 2000 with the SSA, which initially

denied the claim.  On appeal, the SSA determined that Adams was disabled due to an

"Affective Disorder characterized by Mood Disorder secondary to Fibromyalgia," with "pain

exhibiting less than marked limitation in restriction of activities of daily living, difficulties

in maintaining social functioning, . . . concentration, persistence, or pace."  (*Id.,* pp.

0483–485).  Adams submitted a letter from Dr. Rubin dated September 11, 2001.  Dr. Rubin

stated that although "there is little laboratory data to help quantify the intensity of disease .

. . lack of conventional data does not make the patient less ill or the disease less debilitating."

The letter stated that the disabling feature of fibromyalgia is less a specific loss of function

and more persistent fatigue.  Dr. Rubin concluded that Adams was disabled from her position

as a "typist."  (*Id.,* p. 0407).[13]

UNUM initially responded that the additional evidence did not provide a basis for finding Adams disabled from her regular occupation, but then reversed its denial of benefits. UNUM spoke with Adams on January 9, 2002 to tell her that her benefits for the first twenty-four months of disability would be approved, based on her carpal tunnel syndrome, not her complaint of fibromyalgia.  (*Id.,* p. 0498).   In a letter dated January 17, 2002, UNUM concluded that although Adams was capable of sedentary work, her functional limitation of "no frequent hand activities" precluded her from performing the computer tasks required by the System Analyst position she held when she sought disability benefits.  UNUM approved disability benefits from June 13, 2000 to January 31, 2002 and paid Adams an accrued sum of $50,628.83.

## B.   Disability from "Any Gainful Occupation"

In its 2002 decision granting benefits retroactively to 2000 for disability from

---

[13] Dr. Rubin had previously told Adams that he was unable to provide an objective assessment of her impairments due to fibromyalgia.  UNUM had received office notes from Dr. Rubin dated June 6, 2000 that stated as follows:

> With regard to her disability, I told her frankly that both private policies and Social Security Disability were based on objective and measurable features that lead to an inability to participate in gainful employment.  Unfortunately the things that disable fibromyalgia patients, global pain, fatigue, reduced stamina, confusion, etc., are not measurable in an objective fashion, at least not in a way to satisfy most disability criteria. . . . Disability insurance companies provide forms in great detail about lifting, pulling, pushing times, etc.  I told Ms. Adams that I would be unable to fill these [forms] out as the variability of the disease does not allow for accuracy [and] told her that I would be able to provide a narrative summary describing the features that disable her. . . .

(*Id.,* p. 0414).

Adams's regular occupation, UNUM explained that it would begin its review under the standard that applied after twenty-four months of payments:  disability from "any gainful occupation for which you are reasonably fitted by education, training or experience." UNUM asked Adams to complete an Education and Employment History and a Supplemental Statement and to submit any evidence supporting her claim of disability not merely from her prior occupation, but from "any gainful occupation" for which she was "reasonably fitted."  UNUM also asked that her physician complete an Estimated Functional Abilities Form.  UNUM continued to pay Adams disability benefits until July 18, 2003.  (*Id.,* pp. 0499-500).

In response to UNUM's request, Adams identified Dr. Rubin and Dr. Budoff as her treating physicians and reported that her condition had not changed since she left the workplace in January 2000.  Adams also described her current level of capability, stating that she was able to care for herself, but unable to do housework.  She listed "fatigue, dry eyes, and SOB" as the major symptoms of her fibromyalgia.  (*Id.,* p. 0576).

UNUM asked for Dr. Budoff's office notes.  These notes described the results of an April 2001 physical examination of Adams, as follows:

> [Adams] has full active range of motion of all digits of both hands including the thumbs as well as wrists, forearms, and elbows.  Both shoulders have full elevation.  Bilaterally, the flexor-pronator mass is nontender.  There is no pain with resisted forearm pronation or resisted wrist flexion.
>
> For both wrists, the APL and EPB are nontender.  Finkelstein's

41

test is negative.[14]  The EPB stress test is negative.  The flexor carpi radialis is nontender, no pain is elicited on resistance testing.

For both wrists, she is tender over the extensor digitorum tendons of the wrist and has pain with resisted finger extensions with the wrist extended and flexed.  She is slightly tender over the scapholunate articulation and has some pain with dorsiflexion.  She has a negative scaphoid shift.  The finger extension test is no more positive in flexion than it was in extension.

ASSESSMENT:
1.    Bilateral right greater than left lateral tennis elbow.
2.    Bilateral right greater than left rotator cuff tendinosis.
3.    Bilateral trapezial and paracervical strain.
4.    Extensor digitorum tendinitis of the wrist with possibly some dorsal capsulitis.[15]

(*Id.,* pp.0424–26).  During a follow-up examination in May 2001, Dr. Budoff found

improvement in Adams's upper-body pain.  His office notes stated in part as follows:

[Adams] has been doing her strengthening with a theraband for six days a week a week for four weeks.  She feels overall better to about 20% better.  She has a little bit of medial elbow pain.  Her neck also seems to be bothering her.
. . .

 As far as her previous maladies go, [Adams] has full active range of motion of all digits of both hands, forearms, elbows, and shoulders.  Her left wrist lacks 10 degrees of wrist extension but has full wrist flexion.  Her right wrist has full range of

---

[14] This is a test for diagnosing a condition in which both tendons cross the distal radius.

[15]  The rotator cuff is a supporting and strengthening structure of the shoulder.  The extensor digitorum is a muscle on the back of the forearm that extends the fingers and wrist.  Capsulitis means inflammation.  Merriam-Webster Medical Encyclopedia, available at: http://www.nlm.nih.gov/medlineplus/encyclopedia.html (last visited June 24, 2005).

motion.

Both rotator cuffs are nontender.   Both shoulders have a negative Neer test, negative Hawkins test and a positive surpasinaturs test.  They appear to be better.

Her left elbow is tender over the ECRB origin and has significant pain with resisted wrist extension and resisted finger extension.  She is slightly tender over the radial tunnel and has pain referred here with resisted supination.

The right elbow has much milder pain.  She is a little tender over the ECRB and has pain with resisted wrist extension and finger extension but less than the left side.

On the right side, the radial tunnel is not significantly tender. There is no pain with resisted forearm supination with the elbow extended.

Bilaterally she is tender over the flexor pronator mass but has no pain with resisted wrist flexion or pronation.

Her right wrist is tender over the scapholunate interval.  She has a slight amount of pain with dorsiflexion but nothing significant. She has a negative finger extension test and a negative scaphoid shift.

ASSESSMENT:
1.      Bilateral rotator cuff tendinosis, improving.
2.      Left greater than right lateral tennis elbow, improving.
3.      Possible left radial tunnel syndrome.
4.      Cervical strain.
5.      Dorsal wrist capsulitis versus intrinsic ligament injury.

PLAN:
We will continue strengthening for her shoulders and elbows. We will also try symmetric exercise for the neck.  I will inject her wrist.

(*Id.,* p. 00421-23).  Dr. Budoff gave Adams an injection into her right "radiocarpal joint,"

43

which provided some pain relief.  On April 3, 2002, Adams saw Dr. Budoff again.  His office

notes stated in part as follows:

> [Adams] is still having very similar problems . . . . The right
> radiocarpal injection helped a lot for a few months and then
> wore off.  She now complains of pain from the right neck down
> to the dorsal wrist.  There is no history of parathesias.  The pain
> is activity related and bothers her at night.  She has not kept up
> her strengthening.  The left arm has also some activity related
> problems but not as bad.
>
> Her right upper extremity has full active range of motion of all
> digits including the thumb.  She has full wrist flexion, 65
> degrees of wrist extension, and full forearm, elbow, and
> shoulder motion.  Her neck also has good range of motion. . . .

(*Id.,* p. 0522).  Dr. Budoff gave Adams another injection into her right radiocarpal joint.  (*Id.,*

p. 0523).

Sison, the physical therapist, completed a second FCE on March 13, 2002.  In his

report, he concluded that Adams's condition was unchanged since March 2000.  The March

2002 FCE report described the same functional limitations in the same language as the March

2000 report, adding the following two sentences:

> 1.  The patient's functional ability has remained unchanged
> compared to the her [sic] last testing on 03-09-2000.
>
> 2.  She is diagnosed to have fibromyalgia and she is [sic]
> chronic pain affecting her neck, back, UE's and LE's.  She has
> decreased endurance and generalized weakness with limitation
> of ROM for the neck and back.

As in the earlier FCE, Sison found that the "patient is still unable to meet the physical

demand requirements of her job description because of the constant repetitive nature of her

job as a System Analyst for Compaq."  (*Id.,* p. 0512).

Dr. Bellino reviewed Adams's medical records and updated FCE and again found that the evidence indicated that Adams had the ability to perform sedentary activities on a full-time basis.  Dr. Bellino noted that the 2002 FCE report did not include significant limits on Adams's ability to perform sedentary activity.  (*Id.,* p. 0538).

On January 17, 2003, UNUM sent Adams a letter stating that a final determination on her benefits was pending and asking her to meet with Betty Leininger, a nurse case manager for UNUM.  The meeting occurred in February 2003.  As described in Leininger's report, Adams stated that she suffered from fibromyalgia, chronic fatigue syndrome, and chronic shoulder, neck, and back pain.  Adams denied that carpal tunnel syndrome was a basis for her disability. (*Id.,* pp 0544-45.)  Adams stated that her carpal tunnel syndrome had resolved and the pain in her wrists was caused by an "autoimmune connective tissue disorder related to fibromyalgia."   Adams reported her daily activities as washing dishes and using a computer and internet "some" at home, but noted that the extent of her computer use was "nothing like the 100 emails per day [she] received as a systems analyst."  Adams described the following restrictions:

> 1.  Constant spasms in her arms and hands that prevented writing or keyboarding.
> 2.  Her neck hurt like a whiplash injury.  The pain created the need to wear a neck brace or to lie down at times.
>
> 3.  Her lower back and legs hurt, which prevented excessive walking or sitting.  She occasionally used a cane to walk.

(*Id.,* pp. 0544–46).

On March 6, 2003, UNUM informed Adams that it needed more medical information. On March 10, 2003, Adams sent office visit notes from Dr. Kant, which included normal MRI tests and X-rays that showed no fracture, dislocation, or major arthritis.  (*Id.*, pp. 0551–54).  For the first time during the review process, Dr. Rubin completed an Estimated Functional Abilities Form, concluding that Adams's sedentary activity capacity was limited to three hours a day.  Dr. Rubin stated that Adams was able to frequently sit and walk; occasionally do repetitive leg/arm movements, stand, bend, climb, and reach; and occasionally lift, carry, and push and pull up to ten pounds.  With respect to hand functioning, Dr. Rubin checked "yes" to "simple grasp" and "medium dexterity" activities for both hands and "no" to "fine manipulation" and "power grip" activities in both hands. (*Id.*, p. 0577).

UNUM nurse Angela Sandberg reviewed Adams's file and concluded that the restrictions and limitations found by Dr. Rubin were overly restrictive, based on the other evidence in the medical records as to her capabilities.  "There is no evidence that indicates that the clmt suffers from a condition which would preclude sedentary activity on a full time basis."  (*Id.,* p. 0580).  In a letter dated July 18, 2003, UNUM informed Adams that it would no longer provide benefits because she no longer met the definition of "disabled."  The denial letter stated in part:

> On the Attending Physician's Statement, Dr. Rubin provided a diagnosis of fibromyalgia.  He indicated that you can occasionally lift up to 10 pounds and you are able to use both hands for simple grasp and medium dexterity.  According to Dr. Rubin, you are unable perform fine manipulation or power grip.

He also indicates that you have the capacity to perform three hours of sedentary activity.

Your symptoms in relation to carpal tunnel appear to have resolved, as you indicated to our nurse case manger, Betty Leininger, RN on February 21, 2003.  There is no evidence that you have restrictions and limitations regarding the use of your upper extremities.

Based on the medical information in your claim file, three hours of sedentary capacity as indicated by Dr. Rubin is overly restrictive.  There is no evidence to indicate that you have a medical condition that would preclude sedentary activity on a full time basis.

Your occupation as a Business Systems Analyst IV is a sedentary occupation requiring occasional lifting up to 10 pounds and frequent hand activities, such as typing on a computer keyboard.  Our review concludes that you are no longer impaired from performing your own occupation.  The [vocational consultant] reviewed your restrictions and limitations and concluded that you would also be able to engage in [four other] sedentary occupations.[16]

(*Id.,* p. 0590).

Adams appealed the denial; requested that her claim file be reviewed by an independent expert physician in fibromyalgia; and submitted letters from Dr. Rubin and Dr. Salvato, who specializes in treating fibromyalgia and chronic fatigue syndrome, concluding that Adams was "totally disabled from any gainful employment."  Dr. Rubin's letter stated

---

[16]  UNUM prepared a Transferable Skills Analysis to determine other comparable occupations that could be performed by Adams at a full-time sedentary functional capacity based on her work history, experience, education and training.  The TSA lists the occupations of programmer analyst, systems programmer, computer programmer, user support analyst and data processing auditor as consistent with Adams's needs and experience. (*Id*., pp. 0582-86).  The TSA is premised on an absence of "any restriction or limitation to the use of [the] upper extremities."  (*Id*.).

that "the physical limitation imposed by the disease include a significant zapping of stamina

and an inability to perform any kind of motion repetitively whether walking, sitting, standing,

pushing, pulling, climbing, or stooping (or frankly any action verb)." (*Id.,* p. 0599). Dr.

Salvato examined Adams for the first time in October 2003. Based on a review of her

medical records and a physical examination, Dr. Salvato concluded that Adams was disabled

from any gainful occupation, stating in part as follows:

> Please allow this to serve as additional supporting evidence of
> the disability of Ms. Melodie Adams. Ms. Adams presented to
> my office for an initial visit on 10/10/03 . . . with a diagnosis of
> Fibromyalgia, a positive ANA, Hashimoto's thyroiditis. She
> had been seen by Dr. Richard Rubin previously with a diagnosis
> of Fibromyalgia. Her main symptoms were total body muscle
> pain, insomnia, joint pain, persistent fatigue and short-term
> memory loss. She had also been diagnosed with RLS (restless
> leg syndrome) as well as ruptured silicone implants. Extensive
> review of old records show the following pertinent points. . . .
> [T]his patient has a clear diagnosis of Fibromyalgia (FM). . . . It
> is well-known that this disease can cause severe disability and
> objective data provided in this patient's case further supports her
> disability. In addition, this patient has been granted her Social
> Security benefits in a decision that was fully favorable to the
> patient. Obviously, the strict criteria of the Social Security
> Administration, deemed Ms. Adams totally disabled from any
> gainful employment.
> . . .
>
> Another totally objective finding is Ms. Adams'
> neuropsychological evaluation done by Dr. Larry Pollock on
> 7/10/00 . . . Results from that evaluation showed mild cognitive
> deficits, particularly with memory functioning, involving rote
> verbal learning and continued recognition tasks. Impairments
> in verbal learning and memory were also noted. . . .
>
> In addition to these old records, I did a complete history and
> physical examination in my office. On examination, Ms. Adams

was found to have 18 out of 18 tender points consistent with the American College of Rheumatology's criteria for Fibromyalgia. In addition, she underwent full range of motion and manual muscle testing and has objective findings of decreased strength and range of motion in many of her joints, specifically on neck flexion, her neck flexion is normal at 45 on the left and right but she has only 4/5 strength on the right and 3/5 strength on the left. Her neck extension shows decreased range of motion on the right to 40% with muscle strength on the left at 3/5 and on the right at 2/5. On lateral flexion of the neck, she has normal range of motion bilaterally, but her strength is 2/5 on the right and 1/5 on the left. On trunk flexion of the lumbar area, her range of motion on the right is decreased to 45 with 1/5 strength bilaterally. On trunk lateral flexion of the lumbar area, her range of motions are normal but her strength is decreased 4/5 bilaterally. On shoulder flexion, she has 3/5 strength bilaterally. On internal rotation of the shoulder, her range of motion on the left is decreased 60% and she has decreased range of motion on the left of 3/5 and on the right at 4/5. At wrist flexion, her range of motion is normal but strength is decreased at 4/5 bilaterally. Wrist extension is limited on range of motion at 60% on the right with 4/5 strength bilaterally. Wrist radial deviation range of motion is normal but there is decreased strength bilaterally at 3/5. Hip flexion with the knees extended shows decreased range of motion at 80%, both right and left, with 4/5 strength on the right and left. . . . On knee flexion, she is decreased on the left at 125 with 4/5 strength bilaterally. Her ankle flexion and dorsiflexion are normal.[17]

From my initial history and physical exam, I have found objective findings for [Adams's] diagnosis of Fibromyalgia with significant decrease in strength and range of motion in the joints mentioned. She also meets the American College of

---

[17] Although Dr. Salvato's report does not indicate the scale she used to perform the manual muscle testing, it appears she used the scale developed by the British Medical Research Council (MRC) to grade muscle strength using numbers 0 (paralysis) to 5 (normal ). The MRC scale indicates the following: 5 = normal power; 4 = weak movement against resistance (grades 4+, 4 and 4- refer to movement against strong, moderate and slight resistance); 3 = can move against gravity but not against resistance; 2 = can move but not against gravity; 1 = muscle contraction but no joint movement; 0 = no contraction. The scale is insensitive to subtle differences in strength, particularly in grade 4.

> Rheumatology's criteria for Fibromyalgia based on tender-point evaluation. [The medical records I reviewed all] point to the objective nature of her disease and support her disability. It is my opinion that Ms. Adams is totally disabled from any gainful employment.

(*Id.,* p. 0597-98).

On October 27, 2003, Angela Sandberg reviewed the new information and earlier files of Adams's record. Sandberg described the evidence as duplicative of prior reports and noted that Adams had not submitted any evidence of medical treatment for the ten-month period before the October 2003 appointment with Dr. Salvato. The only new medical data was from Dr. Salvato's examination on October 10, 2003. Sandberg noted a lack of data linking the reported limited ranges of motion and decreased strength with fibromyalgia, stating that the reported findings were expected of arthritis or "joint deformity, heat at the joint sites, erosions or calcifications." Finally, Sandberg noted that the treatment approach for fibromyalgia involved physical activities that exceeded a sedentary level. Sandberg concluded that she expected Adams had the capacity for full-time work at a sedentary level of activity.

Dr. Paul Wentland, an internist, also reviewed Adams's information and concluded that Dr. Salvato's findings were inconsistent with other records showing Adams's activities. He noted that the strength levels Dr. Salvato reported for certain muscle groups required postural difficulties that Adams did not exhibit; if she had the strength impairments Dr. Salvato found, Adams would have been unable to sit, stand, or hold her head up. In addition, Dr. Wentland stated that fibromyalgia does not cause muscle weakness and found an

50

inconsistency between Dr. Salvato's conclusion that Adams was totally disabled and the FCE reports that found Adams could perform sedentary activity.  (*Id.*, pp. 0626-27).

On December 1, 2003, UNUM denied Adams's appeal.   The denial letter acknowledged that Adams had fibromyalgia but stated that the amount of sedentary activity Dr. Rubin  and Dr. Salvato reported she could perform was excessively restricted and that her medical records supported the conclusion that she had the capacity to perform her own occupation or another sedentary-level occupation on a full-time basis.  UNUM stated that Dr. Salvato's findings of decreased strength and range of motion in the neck, shoulders, and back were inconsistent with other medical records and Adams's actual capability.  (*Id.*, p. 0634). UNUM concluded that although Adams reported and had documented some limited range of motion and decreased strength, these were not "typical findings" of fibromyalgia and she did not show any signs of arthritic conditions that might produce such symptoms.  As to cognitive capabilities, UNUM concluded that the record did not support extensive cognitive limitations and noted that Adams was not receiving ongoing treatment for, or  impaired by, depression.

Adams reappealed and provided UNUM with additional medical information, consisting of a lumbar spine MRI performed on November 18, 2003.  The MRI showed:

> Broad-based bulge at L4-5.  This combined with moderate facet hypertrophic changes results in moderate bilateral neural foraminal encroachment.  The exiting right L4 dorsal  root ganglion is contacted from disc material and clinically this could result in a right L4 radiculopathy.  The left dorsal root ganglion does not appear mechanically compressed.

51

> Small broad-based bulge at L5-S1.  The canal is well in excess
> of 1cm and the neural foramina are moderately encroached.  The
> exiting dorsal root ganglia do not appear mechanically
> compressed.
>
> The upper three lumbar levels are normal.

(*Id.,* pp. 0637-38).  Dr. Susy Vergot reviewed this information and other records in Adams's

file.  Dr. Vergot concluded that the MRI did not show that Adams could not perform at a

sedentary physical level because the dorsal root ganglions "are not encroached."  Dr. Vergot

noted that fibromyalgia was not a progressive condition and would not be exacerbated by

activity.  (*Id.,* pp. 0640-41).

On January 23, 2004, UNUM advised Adams that it had completed its final review

of her file and that  it was maintaining its position denying her claim:

> Our physician agrees that the diagnosis of fibromyalgia is
> supported given the clinical evidence provided.  However, this
> condition would not preclude her from performing full-time
> sedentary activities.  While Ms. Adams has reported limited
> range of motion and decreased strength in her extremities, there
> is no basis for these findings given the diagnostic studies
> performed or her physicians' evaluations.  In addition, Ms.
> Adams' ability to perform activities of daily living
> independently and use a computer at home are inconsistent with
> her claimed functional capacity.  In addition, the assessment of
> Dr. Salvato which was provided was not credible given the
> strength levels reported being entirely inconsistent with Ms.
> Adams' actual capacity.
>
> . . .
>
> Ms. Adams has previously demonstrated sedentary ability on
> functional capacity evaluations, and there is no indication of a
> worsening of her condition to prevent her from performing full-
> time sedentary work.  Whereas her own occupation is performed

52

> at a sedentary functional level, she is not disabled as defined
> under the terms of the plan.

(*Id.,* p. 0642).

## IV.   The Cross-Motions For Summary Judgment and ERISA Preemption

On April 19, 2004, Adams filed this lawsuit in state court, alleging that her disability benefits were wrongfully terminated and asserting causes of action for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code and Deceptive Trade Practices Act.   UNUM, then the only defendant, removed to this court on the basis of federal question jurisdiction through complete ERISA preemption.   UNUM moved for summary judgment.   In a second amended complaint, Adams added her former employers, Compaq and Hewlett Packard, as defendants. (Docket Entry No. 13).   UNUM moved for summary judgment on the grounds that Adams's state-law claims were completely preempted by ERISA and there was no ERISA violation. (Docket Entry No. 31).   The newly-added defendants moved to dismiss on the grounds that Adams's state-law claims were completely preempted by ERISA.   (Docket Entry No. 34). Adams moved for partial summary judgment on the ground that UNUM abused its discretion and violated ERISA in denying her benefits because she was unable to perform all of the material duties of her regular occupation and unable to perform the duties of a gainful occupation for which she was reasonably suited.   (Docket Entry No. 15).

Although Adams did not earlier move for leave to amend to assert claims under ERISA, she has nonetheless moved for partial summary judgment on the basis that the

benefit denial violated ERISA.  In her response to the motion to dismiss, Adams moved in the alternative for leave to amend her complaint to add an ERISA cause of action.  (Docket Entry No. 15).  Leave to amend pleadings "shall be freely given when justice so requires." FED.R.CIV.P. 15.  The decision to grant leave is "entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion."  *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993); *see Schiller v. Physicians Res. Group Inc.*, 342 F.3d 563, 566 (5th Cir. 2003).  The district court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.  *See Schiller*, 342 F.3d at 566; *Wimm*, 3 F.3d at 139.  Although Adams filed her motion for leave to amend late, defendants have not objected and have instead addressed the ERISA claim on the merits.  As the Fifth Circuit noted in *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d at 269, having removed on the basis of ERISA preemption, defendants cannot oppose a motion for leave to amend to include an ERISA claim. "'ERISA's preemptive and civil enforcement provisions operate to 'recharacterize' such claims into actions arising under federal law.'"  *Id*. (citations omitted).  The motion for leave to amend to add the ERISA claims is granted.

Defendants all assert that ERISA preempts Adams's state-law claims.  ERISA provides for conflict preemption under section 514 and for complete preemption under section 502.  Complete preemption arises under ERISA's civil enforcement provisions when a state-law cause of action duplicates, supplements, or supplants one of the remedies

provided in section 502.[18]  *See Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63-64 (1987);

*Aetna Health Inc. v. Davila,* 542 U.S. 200, 207-08 (2004).  "Section 502, by providing a civil

enforcement cause of action, completely preempts any state cause of action seeking the same

relief."  *Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 337 (5th Cir. 1999).  Complete

preemption exists when "the existence of a pension plan is a critical factor in establishing

liability" and the defendant's legal duty to the plaintiff arises because of the existence of an

ERISA plan.  *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990); *see also Rush*

*Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002).

It is undisputed that the Plan is covered by ERISA.[19]  No party has suggested that the

---

[18]  Section 502(a)(1)(B) allows a plan participant or beneficiary to bring a civil action "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  Section 502(a)(2) allows a plan participant or beneficiary to sue "for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2).  Section 1109(a) in turn provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . .

29 U.S.C. § 1109(a).

[19]  ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1)

Plan is exempt.  (Docket Entry No. 31, Ex. B, p.16.2).  Adams's state-law breach of contract claim is completely preempted because it seeks benefits under section 1132(a).  *See Arana v. Ochsner Health Plan*, 338 F.3d 433, 438 (5th Cir. 2003) (en banc).  Complete preemption permits removal to federal court.  *See Ellis*, 394 F.3d at 269.

Conflict preemption under section 514 of ERISA exists when state-law claims are asserted that "relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."  29 U.S.C. § 1144(a).  A state-law claim may "relate to" a benefit plan even if the law is not specifically designed to affect such plans and the effect is only indirect.  *See Ingersoll-Rand Co.,* 498 U.S. at 139 (*citing Pilot Life Ins. Co. v. Dedeaux* , 481 U.S. 41, 47 (1987)).  Under the "savings clause," a law that "regulates insurance" survives conflict preemption under ERISA.  A state law "regulates insurance" and is "saved" from ERISA preemption if the law satisfies the two-part test set forth in *Kentucky Ass'n of Health Plans v. Miller,* 538 U.S. 329, 341-342 (2003).  First, the state law must be "specifically directed toward entities engaged in insurance."  *Id.*  Second, the state law must substantially affect the risk pooling arrangement between the insurer and the insured.  *Id.*

Adams asserts statutory claims under the Texas Insurance Code, article 21.21 and article 21.55.  Adams's claims under these statutes do not fall into the "savings clause" of 29 U.S.C. § 1144(b)(2)(A) because they do not "substantially affect the risk pooling arrangement between the insurer and the insured.  *Miller,* 538 U.S. at 342; *Ellis*, 394 F.3d at 277.  Before *Miller*, the Fifth Circuit had held that ERISA preempted claims of breach of contract, breach of the duty of good faith and fair dealing, and violations of Article 21 of the

56

Texas Insurance Code.  *See McNeil v. Time Ins. Co.*, 205 F.3d 179, 191-92 (5th Cir. 2000); *Hollis v. Provident Life Acc. Ins. Co.*, 259 F.3d 410 (5th Cir. 2001).  "The only pertinent difference between the *Miller* analysis and the previous test is that in place of the second *Miller* inquiry, the previous test asked whether the statute in question "transfers or spreads the risk from the insured to insurer."  *Provident Life Ins. Co v. Sharpless*, 364 F.3d 634, 640 (5th Cir. 2004).  In *Ellis*, the Fifth Circuit found that articles 21.21 and 21.55 failed *Miller*'s second prong and that claims asserted under those articles were preempted by ERISA.

Adams's claims under the DTPA and for breach of the common-law duty of good faith and fair dealing are also preempted.  Although section 17.50 of the Texas Business and Commerce Code extends to the insurance industry, it is not directed specifically directed at entities engaged in that industry and does not meet the first prong of the *Miller* analysis.  In *Ellis* the Fifth Circuit held that common-law claims for breach of the duty of good faith and fair dealing are preempted.  *See   Ellis,* 394 F.3d at 276 (holding that ERISA preempts common law claims for breach of the duties of good faith and fair dealing under the first prong of the *Miller* analysis because the doctrine is not directed toward entities engaged in insurance); *see also Ramirez* v. *Inter-Continental Hotels*, 890 F.2d 760, 763 (5th Cir. 1989) (article 21.21 "incorporates wholesale the Texas Deceptive Trade Practices Act, a law of general application, and provides a remedy for violations of that law by an insurance company").

Adams's state-law claims are dismissed under ERISA preemption.

**V.     The Summary Judgment Standard**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chemical Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The

nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## VI.    The Record to be Considered

In support of her motion, Adams submitted the expert opinion of Linda Lee, a former UNUM Disability Benefits Specialist, who specializes in "generally accepted claims practices, industry standards of care relative to the disability claims review process, and disability settlements." (Docket Entry No. 26, p. 3). Lee opined that UNUM unreasonably discounted objective medical evidence in favor of the medical opinions of its own physicians and followed a corporate policy of presumptively denying disability benefits based on fibromyalgia. Lee attached a copy of a June 29, 2002 Fibromyalgia Position Statement and Guidelines prepared by UNUM, which states that reported limitations in an FCE do not

automatically support disability and emphasizes the need for individualized review in each claim including assessment of the claimant's daily activities. Lee opined that the Position Statement evidences a corporate policy to treat fibromyalgia as presumptively nondisabling.

UNUM moves to strike the expert opinion of Linda Lee as outside the administrative record that is properly before this court. (Docket Entry No. 31). In reviewing a plan administrator's decision under the abuse of discretion standard, federal courts are limited to the evidence in the administrative record, except for certain limited exceptions. As the Fifth Circuit has explained in an *en banc* opinion:

> Once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions. To date, those exceptions have been related to either interpreting the plan or explaining medical terms and procedures relating to the claim. Thus, evidence related to how an administrator has interpreted terms of the plan in other instances is admissible. Likewise, evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim would be equally admissible. However, the district court is precluded from receiving evidence to resolve disputed material facts – i.e., a fact the administrator relied on to resolve the merits of the claim itself.

*Vega*, 188 F.3d at 299 (internal citations omitted); *see Gooden*, 250 F.3d at 333 (explaining same). The administrative record consists of relevant information made available to the administrator prior to the filing of the lawsuit and in a manner that gives the administrator a fair opportunity to consider it. *See Estate of Bratton v. National Union Fire Ins. Co. of Pittsburgh, PA*, 215 F.3d 516, 521 (5th Cir. 2000).

This court agrees with UNUM that Lee's expert report is outside the administrative

record and does not fall within any exception that makes it admissible.  The 2002 Position Statement that Lee cites is not part of the administrative record, and Adams offers no basis for concluding that UNUM relied on or used the Position Statement during the review of Adams's claim in "interpreting the plan or explaining medical terms and procedures relating to the claim."  *See Vega*, 188 F.3d at 299.[20]  In addition, the major part of Lee's report consists of her opinion as to whether UNUM's claim practices met the legal standards.  Lee's opinion as to whether or not UNUM failed to act in good faith is improper expert testimony. *See Pilot Life*, 481 U.S. at 49-51 ("bad faith does not define the terms of the relationship between the insurer and the insured"); *Gosselink v. AT&T, Inc.*, 272 F.3d 722, 727 (5th Cir. 2001) (evidence of bad faith and violations of relevant regulations may be considered in court's abuse of discretion review).

UNUM's motion to strike Lee's expert report is granted.

## VII.  An ERISA Violation

The issue is whether substantial evidence supports UNUM's decision that Adams was not disabled from performing the duties of any gainful occupation for which she was reasonably suited after July 18, 2003.  A decision is not arbitrary and capricious if it is supported by substantial evidence.  *MediTrust Financial Services Corp. v. Sterling*

---

[20]  Moreover, the Position Statement does not provide a basis for any inference that UNUM abused its discretion in Adams's case by taking a position that presumptively denied disability for any fibromyalgia claim.  The Position Statement highlights the difficulty presented by claims of disability based on fibromyalgia, which has no objective diagnostic test or measure.  The Statement notes this difficulty and emphasizes the need for individualized review.  As discussed below, numerous federal courts have highlighted the same difficulty and reached the same conclusion as to the need for individualized examination.

*Chemicals, Inc.*, 168 F.3d at 215.  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Lain*, 279 F.3d at 342 (citations omitted).  If the plan administrator's decision is "supported by substantial evidence and is not arbitrary or capricious, it must prevail."  *Ellis*, 394 F.3d at 273; *see also Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004) ("Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary.").

The courts have encountered difficulties in reviewing disability benefit denials for plan participants claiming disability as a result of fibromyalgia and a condition that is often associated with it, chronic fatigue syndrome.  The subjective and inherently self-reported nature of fibromyalgia's primary symptoms of pain and fatigue complicate disability benefit decisions and the review of benefit denials.  In *Welch v. Unum Life Insurance Co. of America*, 382 F.3d 1078 (10th Cir. 2004), the court recently summarized the cases analyzing the problems for disability insurers and courts reviewing their decisions presented by a disorders such as fibromyalgia and CFS that have no objective test for diagnosis:

> "Because proving the disease is difficult . . . , fibromyalgia presents a conundrum for insurers and courts evaluating disability claims."  *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999).  *Compare id.* (holding that "no objective test exists" for proving fibromyalgia); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) ("[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms

are entirely subjective."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("[A] growing number of courts, including our own, . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'") (quoting *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (noting that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . . , but the amount of pain and fatigue that a particular case of it produces cannot be"); and *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 562 (7th Cir. 2000) (holding that fibromyalgia's "cause is unknown, there is no cure, and the symptoms are entirely subjective"); *with Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003) (noting that Social Security claimant's testimony and reports to the Social Security Administration were "supported by objective medical evidence of fibromyalgia"); and *Russell v. UNUM Life Ins. Co. of Am.*, 40 F.Supp.2d 747, 751 (D.S.C. 1999) (considering a nearly identical self-reported symptoms limitation and holding that fibromyalgia is an objectively diagnosable condition).

*Id*. at 1087.

Courts have held that it is *prima facie* unreasonable to require claimants to submit objective evidence of the etiology of the disease, given that there are no recognized objective laboratory tests.  See *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997); *Cook v. Liberty Life Assur. Co.*, 320 F.3d 11, 21–22 (1st Cir. 2003); *Hawkins v. First Union Corp. LTD Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (Posner, J.); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir. 1999); *Burchill v. Unum Life Insur. Co. of Am.*, 327 F. Supp.2d 41, 51

(D. Me. 2004); *Pralutsky v. Met. Life Insur. Co.*, 316 F. Supp.2d 840, 852-53 (D. Minn. 2004); *Maronde v. Sumco USA Group Long-Term Disability Plan*, 322 F. Supp.2d 1132, 1139 (D. Or. 2004); *Sansevera v. E.I. DuPont de Nemours & Co.*, 859 F. Supp. 106, 113 (S.D.N.Y. 1994).  These courts have recognized that an insurer cannot insist on a standard of proof for proving disabling fibromyalgia that effectively eliminates the possibility of anyone with this condition actually receiving long-term disability benefits.  On the other hand, courts have recognized that an insurer may insist on objective proof and measures of symptoms and of limits on the ability to work, even when, as with fibromyalgia, diagnosis is difficult and subjective complaints such as "fatigue" or "pain" are the signature of the disease.  *See Friedrich*, 181 F.3d at 1112; *Boardman v. Prudential Ins. Co.*, 337 F.3d 9, 16–17 & n.5 (1st Cir. 2003) (upholding denial of benefits based on lack of evidence of total disability, rather than of underlying diagnosis of chronic fatigue syndrome).

The cases consistently recognize that an insistence on objective evidence of restrictions and limitations is not arbitrary and capricious.  *Vercher*, 379 F.3d at 230-31 (upholding a plan administrator's denial of claim based on lack of objective evidence); *Nichols v. Verizon Communications, Inc.*, 78 Fed. Appx. 209, 212 (3rd Cir. 2003) (holding it reasonable to require the claimant to provide objective evidence of her symptoms); *Cook v. New York Times Co. Long-Term Disability Plan*, 2004 WL 203111, at *4 (S.D.N.Y. Jan. 30, 2004) ("[A]n insistence on objective evidence, standing alone, is not arbitrary and capricious.").

The cases make it clear that the determination and review of benefit eligibility is

highly fact-intensive.  It is not sufficient for an ERISA plaintiff to support her claim with

substantial evidence, or even with a preponderance of evidence.  *Ellis*, 394 F.3d at 273

(citing *MediTrust*, 168 F.3d at 215).  The "law requires only that substantial evidence support

a plan fiduciary's decisions, including those to deny or to terminate benefits."  *Id.*  The

burden of proof and the standard of review  is the same whether the decision is an initial

denial or a decision to terminate previously granted benefits:

> When a plan fiduciary initially determines that a covered
> employee is eligible for benefits and later determines that the
> employee is not, *or has ceased to be,* eligible for those benefits
> by virtue of medical information received, the plan fiduciary is
> not required to obtain proof that a substantial change in the LTD
> recipient's medical condition occurred *after* the initial
> determination of eligibility.

*Ellis v. Liberty Life Ass. Co.,* 394 F.3d at 273.

> 1.      *The Issue of Adams's Ability to Perform Sedentary Work*

UNUM concluded that despite the diagnosis of fibromyalgia, Adams had the stamina

and physical capability to perform sedentary work on a full-time basis.  The FCEs performed

by Sison in 2000 and 2002 indicated that she was able to perform sedentary work, with the

ability to sit and walk for up to 66 percent of the day and able to lift up to ten pounds

occasionally and bend, kneel, and climb stairs occasionally.  Diagnostic examinations of the

spine revealed no condition that would produce disabling back or neck pain, and other

diagnostic tests showed no arthritic process.  UNUM's decision that Adams could perform

sedentary work is supported by substantial evidence in the record.  Given the administrative

record in this case, the fact that Adams reported pain is insufficient by itself for this court to

conclude that UNUM's decision was arbitrary and capricious, given the evidence as to her capability to sit for extended periods and to walk, reach, and perform similar activities at a level compatible with sedentary work. *See Aboul-Fetouh v. Employee Benefits Committee,* 245 F.3d 465, 473 (5th Cir. 2001) ("While [the plaintiff] offers some evidence that he continued seeking treatment for pain, that evidence does not indicate that [he] suffered from those symptoms at such a level that he would have been unable to perform his work. . . .").

Adams argues that UNUM abused its discretion because it disregarded the opinion of her treating physicians that she was totally disabled from performing any gainful employment. The administrative record contains opinion letters from Dr. Rubin and Dr. Salvato expressing their opinions that Adams was totally disabled from performing any gainful occupation. Adams submitted the opinion letters for the first time on appeal. Neither Dr. Salvato nor Dr. Rubin was treating Adams in January 2000, when Adams claims she first became disabled; Dr. Salvato had only seen Adams once, to prepare the report for the appeal from the 2003 denial of benefits. It is also significant that Dr. Ali, the treating physician who had the most experience with Adams and her fibromyalgia, which she identifies as the primary cause of her disabling pain and fatigue, did not indicate in any of his correspondence with UNUM or his office notes that she had significant functional limitations that would prevent her from working. UNUM requested, but never received, a Functional Capacities Evaluation from Dr. Ali.

Dr. Rubin, who saw Adams for the first time in 2000, submitted a letter dated September 18, 2003 concluding that Adams was disabled from performing any gainful

occupation.  The letter stated that "the physical limitation imposed by the disease include a significant zapping of stamina and an inability to perform any kind of motion repetitively whether walking, sitting, standing, pushing, pulling, climbing, or stooping (or frankly any action verb),"and concluded that Adams could only perform sedentary  activities for up to three hours in an eight-hour work day.  (Docket Entry No. 31, Ex. A-2,  p. 0599).  Some of these observations are at odds with Sison's FCE examinations, which in 2000 and 2002 found that Adams could sit and walk for up to 66 percent of a day.  Dr. Rubin did not complete a Functional Capacities Evaluation form until 2003.  Interestingly, Dr. Rubin had previously told Adams that he was unable to provide an objective assessment of her impairments due to fibromyalgia, because she suffered from symptoms of fibromyalgia that "are not measurable in an objective fashion, at least not in a way to satisfy most disability criteria, . . . I told Ms. Adams that I would be unable to fill these [FCE forms] out as the variability of the disease does not allow for accuracy [and] told her that I would be able to provide a narrative summary describing the features that disable her. . . ."  (*Id.*, p. 0414).

Dr. Salvato, who apparently only saw Adams once in 2003, opined that Adams was totally disabled based on her medical records and a physical examination.  UNUM's medical consultants found that Dr. Salvato's report was not credible.  UNUM's medical consultant, Dr. Wentland, noted that according to the strength levels reported by Dr. Salvato, Adams would not have the ability to sit or stand up straight.[21]  Dr. Wentland also found Dr. Salvato's

---

[21]  Other evidence in the record suggested that Adams did not experience significant muscle weakness.  Nerve conduction studies performed by Dr. Ramzy in September 1999 to assess Adams's muscle strength  demonstrated "[n]ormal insertional activities; normal resting potentials; normal motor unit action

reliance on the FCEs inconsistent with her conclusion of total disability.  (Docket Entry No.

31, Ex. A-2, pp.0626- 27).  *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161,

172 (6th Cir. 2003) (whether an administrator acted arbitrarily and capriciously, the district

court has an obligation that "inherently includes some review of the quality and quantity of

the medical evidence and the opinions on both sides of the issues").

UNUM did not abuse its discretion by declining to rely on the conclusions of Dr.

Rubin and Dr. Salvato, because the denial of benefits was "based on evidence, even if

disputable, that clearly supports the basis for its denial."  *Lain*, 279 F.3d at 342 (quoting

*Vega*, 188 F.3d at 299).  The Fifth Circuit has held that a plan administrator need not give

more weight to the opinion of a claimant's treating physicians than it gives to the opinions

of other physicians or other evidence in the record, and that it is not an abuse of discretion

for a plan administrator to rely on the conclusions of physicians who have only reviewed a

claimant's medical records without conducting a physical examination of the claimant.  *See*

*Gooden v. Provident Life & Accident Ins. Co.,* 250 F.3d 329, 335 (5th Cir. 2001); *Donato v.*

*Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994) (holding that a denial of benefits

was not an abuse of discretion when the "decision simply came down to a permissible

choice" between the positions of the administrator's medical consultants and the claimant's

---

potential toward maximum voluntary contraction." (Docket Entry No. 31, Ex. A-2, p. 0475).  In March 2000,
muscle tests showed "[n]ormal irritability in all muscles tested. . . . Recruitment pattern is excellent with no
spontaneous electrical activity at rest."  (*Id.,* p. 0457).

physicians).[22]  In *Vercher,* the Fifth Circuit affirmed the denial of benefits based on evidence in the administrative record that the plaintiff's disability "did not render her completely unable to perform . . . her regular occupation" although her doctors recommended medical retirement.  *Vercher,* 379 F.3d at 229-31.  That evidence included an FCE that indicated the plaintiff was able to work at a sedentary level; the opinion of a consultant who found "no objective evidence" of an impairment that would prevent employment; and the plaintiff's reported activity level.  *Id.*  This case is similar.  Two FCE reports and other examinations supported the conclusion that Adams could perform work at a sedentary level, including an ability to sit and walk up to 66 percent of the day and stand up to 33 percent of the day. While Dr. Salvato provided objective measures of reduced strength, at least some of those measures were rejected as reporting such severe weakness that Adams would not be able to sit or stand, which was clearly inconsistent with other objective evidence in the record.  *See Gannon,* 360 F.3d at 213 (denial of benefits was supported by "objective clinical evidence that [plaintiff] was physically capable of performing restricted work activities"); *Blickerstaff*

---

[22]  This court does not rely on statements  by some of the UNUM reviewers that would, if followed to their logical conclusion, lead to denying benefits for virtually every fibromyalgia sufferer.  For example, one UNUM reviewer noted that Adams had continued to work for three years after the onset of her fibromyalgia symptoms, despite the fact that fibromyalgia is not progressive.  As other courts have noted, it is entirely logical that a fibromyalgia patient suffering from increasing pain and fatigue would attempt, for a time, to "fight through" despite decreased productivity and increasing pain and fatigue.  *Neumann v. Prudential,* 367 F.Supp.2d at 991.  Another reviewer noted that fibromyalgia is best treated by activity, not removal from a sedentary workplace.  Again, courts have rejected such a sweeping discount of the possibility of a fibromyalgia sufferer having symptoms so severe that she is totally disabled from any sedentary work and have recognized that while many who suffer from fibromyalgia can carry on daily activities, some people have "such a severe case . . . as to be totally disabled from working."  *Stup,* 390 F.3d at 303 (upholding district court ruling that plan administrator abused its discretion by denying LTD benefits to fibromyalgia sufferer) (quoting *Sarchet,* 78 F.3d at 307) (citations omitted).  This court does not include these portions of the UNUM administrative record in the evidence supporting the denial of long-term disability benefits.

*v. R.R. Donnelly and Sons Co., Short Term Disability,* 378 F.3d 669, 677 (7th Cir. 2004) (holding that administrator reasonably terminated benefits based on functional capacity evaluation).

In addition to medical evidence that suggests Adams's symptoms were not sufficiently severe to preclude gainful employment, UNUM considered the effect of workplace accommodations. Although Adams reported discomfort from standing or sitting for more than an hour and general weakness, UNUM noted that Adams could change positions throughout the day and take breaks to stand up and walk around as needed. Because Adams could perform the duties of gainful occupations for which she was suited without having to sit at a desk without a break, UNUM concluded that she could perform sedentary work despite her inability to sit for longer than an hour. *See Turner v. Delta Family-Care Disab. & Surv. Plan*, 291 F.3d 1270, 1273-74 (11th Cir. 2002) (per curiam) (affirming summary judgment for administrator who determined plaintiff could perform clerical work by "changing positions as needed").

Many of the cases showing disability from fibromyalgia show symptoms that Adams did not exhibit and unequivocal and consistent reports from a treating physician. For example, in *Neumann v. Prudential*, in which the court conducted a *de novo* review of the benefit denial decision, the plaintiff's fibromyalgia was so severe that she was required to take significant naps throughout the day and could not concentrate during the testing that was part of the diagnostic process. The administrator rejected an independent medical examiner's conclusion that the plaintiff's cognitive difficulties were "clearly defined" in her medical

records and based its denial on the opinion of a single expert that fibromyalgia sufferers cannot be totally disabled. *Id.*, 367 F.Supp.2d at 990.  In *Stup v. UNUM Life Ins. of Amer.,* 390 F.3d 301, 306 (4th Cir. 2004), the court held that the administrator abused its discretion in denying benefits when the plaintiff suffered from fibromyalgia, degenerative disc disease, and "lupus erythematosus" that resulted in "limited mobility and pain in both her hands." The rheumatologist who had treated the plaintiff for years provided consistent and detailed reports describing objective measures of the effects of these conditions on the plaintiff's physical capabilities and her continued compliance with the recommended treatment regime. No such evidence is present in this record. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 234-36 (4th Cir. 1997) (administrator did not abuse its discretion when the plaintiff presented unclear etiology, conflicting reports from her own health care providers, and review panel determined that the plaintiff should possess greater functional capacities based on the symptoms reported).

### 2.    *The Issue of Adams's Limitations on the Use of Her Hands*

The record shows that Adams experienced some functional limitations on repeated hand motions because of pain, decreased strength, and limited range of motion.  The FCEs described specific limitations on the work that Adams was able to perform with her hands. According to both FCEs, Adams could perform "Occasional Low Speed Activity" and "Occasional Light Grasping/Gripping."  The FCEs also stated that Adams could not perform "frequent hand activity."  Adams's job at Compaq required constant keyboarding.  The issue is not whether Adams is unable to perform that job, but whether she is unable to perform

"any gainful occupation" for which she is reasonably suited.  Substantial evidence supported

UNUM's conclusion that Adams's restriction on repeated hand activities did not make her

totally disabled.[23]

UNUM noted that Adams acknowledged that she used a computer at home, although

not at the level necessary to perform her prior job at Compaq.  UNUM obtained office notes

from Dr. Budoff showing that as of April 2002, Adams's functional use of her hands was not

severely limited.  Dr. Budoff wrote that Adams "has full active range of motion of all digits

of both hands, forearms, elbows and shoulders.  Her left wrist lacks 10 of wrist extension but

has full wrist flexion.  Her right wrist has full range of motion. . . . She has a slight amount

of pain with dorsiflexion but nothing significant."  "She is tender over the flexor-pronator

mass but has no pain with resisted wrist flexion or pronation."  Dr. Budoff also noted that the

steroid injection "helped a lot for a few months and then wore off."  (Docket Entry No. 31,

Ex. A-2, pp. 0522–27).  In April 2001, Adams saw Dr. Crockett, an orthopedic surgeon, who

performed a physical examination.  Like Dr. Budoff's notes, Dr. Crockett's office notes

described "full range of motion of both wrists, elbows, and shoulders."  (*Id.*, p. 0419).  In

2003, with respect to hand functioning, Dr. Rubin checked "yes" to "simple grasp" and

"medium dexterity" activities for both hands.  Dr. Salvato's report appears to focus on

decreased strength and range of motion in Adams's neck, shoulders, and back, finding

---

[23] It appears that the functional hand limitations Sison described in the 2000 and 2002 FCEs were primarily related to carpal tunnel syndrome.  Sison attributed Adams's hand limitations to "tight soft tissue," "minimal scar tissue," and muscle weakness. In 2003, Adams told a UNUM representative that her carpel tunnel syndrome had resolved and that she could not use a keyboard due to "spasms" – a symptom which had not been reported or discussed in her medical records.  (Docket Entry No. 31, Ex. A-2, pp. 0544-46).

normal range of motion in two wrist measurements, wrist flexion and wrist radial deviation

range of motion, with only slight decrease in strength (4/5 for flexion and extension and 3/5

for wrist radial deviation).

It is undisputed that Adams's carpal tunnel syndrome had not recurred and was not

a factor in any significant limit on the use of her hands and wrists.  UNUM points to the

medical tests ruling out recurring carpal tunnel syndrome as the basis for its decision in 2003

that she could  in fact perform the duties of her regular occupation, in addition to the duties

of "any gainful occupation," despite the earlier decision that she was disabled from her

regular occupation.  A plan administrator is free to change a benefits decision on further

investigation and review.  *Ellis v. Liberty Life Ass. Co.*, 394 F.3d at 273.  The inquiry is not

whether UNUM changed its mind, or whether Adams is indeed able to perform her regular

occupation, but rather whether substantial evidence in the record supports UNUM's

conclusion that she is able to perform the duties of any gainful occupation for which she is

suited.

The dispute is not whether Adams is able to perform a job requiring the virtually

constant amount of keyboarding that her prior position at Compaq had required.  The

vocational assessments that are part of the administrative record show other, similar jobs in

the economy.  There is nothing in the record to suggest that all jobs suitable for Adams – who

has a G.E.D. and who had worked as a systems analyst for 20 years – required constant

typing.  The primary focus of the parties' dispute is whether Adams is able to perform any

sedentary occupation for which she was suited, not whether she is able to perform a job

requiring constant typing.  Courts have recognized that summary judgment is appropriate when the plaintiff's medical records indicate that she is capable of performing some work, albeit with certain restrictions, and disability is defined as an inability to perform any gainful occupation.  *See Duhon v. Texaco, Inc.,* 15 F.3d 1302 (5th Cir. 1994) (holding that administrator did not abuse its discretion in denying benefits based on finding that the plaintiff could perform "any job that required only sedentary or light work" under plan that required disability from performing "any job for which [the participant] is qualified"); *Turner,* 291 F.3d at 1273 (upholding summary judgment because the plaintiff, who had received payments for two years, failed to demonstrate disability under "any occupation" standard of disability); *see also Salter v. Continental Casualty Co.,* 132 Fed. Appx. 337, 340 (11th Cir. 2005) (upholding summary judgment based on plaintiff's failure to rebut evidence that the administrator's denial was based on two vocational assessments demonstrating that the plaintiff was not totally disabled from engaging in any employment).

### 3.    *The Issue of Cognitive Limitations*

Adams argues that UNUM abused its discretion by not recognizing the disabling effects of the cognitive limits associated with her fibromyalgia.  The only cognitive testing Adams submitted was performed by Dr. Pollock.  The record shows that UNUM requested the raw data of the neuropsychological testing Adams received from Dr. Pollock.  Dr. Jay analyzed the data and noted the high scores on several of the diagnostic tests.  For example, Adams's "executive functioning" was average to superior.  Dr. Jay's conclusions were as follows:

> [C]ognitive slowing was not evident. The WAIS-R digit symbol subtest showed an age-corrected finding of 9, a centrally average finding.  In addition, Dr. Pollock noted that other findings in visual processing speed were high average to superior.  [UNUM thought] these findings collectively argued against a diffuse encephalopathic process such as has been purported to accompany selected cases of fibromyalgia. Moreover, the World Health Organization has indicated that block design construction has appeared to be sensitive to the encephalophathy associated with fibromyalgia.  Yet in this case, an age-correlated score of 13 was seen on block design, a high average finding.

(Docket Entry No. 31, Ex. A-2, p. 0384).  Dr. Salvato noted "short-term memory loss" and Dr. Rubin's 2003 letter noted "cognitive dysfunctions," but neither provides any detail or office records.  Dr. Rubin referred Adams and to Dr. Pollock.  Dr. Salvato relied on Dr. Pollock's report.

The record supports UNUM's conclusions that the cognitive deficits Adams may have were not so severe as to prevent her from working in the type of job her experience and education qualified her to fill.

### 4.    *The Issue of the Social Security Administration's Finding*

This court also rejects Adams's argument that UNUM abused its discretion by failing to credit the SSA's determination that she was totally disabled.  It is well settled that SSA decisions are not binding on a plan administrator and that there is "no obligation to weigh the agency's disability determination more favorably than other evidence."  *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir. 1999).  Differences between the Social Security disability program and ERISA benefits plans caution against importing standards from the first into the

second.  In *Black & Decker Disability Plan v. Nord,* 538 U.S. at 832, the Supreme Court explicitly rejected the argument that ERISA administrators must comply with the "treating physician" rule that governs in the Social Security context.  The Court held that in ERISA cases, courts have "no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Id.* at 834.  ERISA – unlike the Social Security Act – does not require that benefit determinations be made with deference to the opinions of treating physicians.  *See* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2) (setting forth the SSA regulation that accords "special weight" to the medical opinion of an applicant's treating physician).

The SSA determined that Adams was disabled due to an "Affective Disorder characterized by Mood Disorder secondary to Fibromyalgia," with "pain exhibiting less than marked limitation in restriction of activities of daily living, difficulties in maintaining social functioning, . . . concentration, persistence, or pace." (*Id.,* pp. 0483-485).  This determination was not binding on UNUM and the difference in the result does not show an abuse of discretion.

Given the deferential standard of review and the lack of objective medical evidence of symptoms sufficiently severe to make Adams unable to perform the duties of any gainful occupation, supporting disability, this court concludes that UNUM did not abuse its discretion.  *See Wise v. Hartford Life and Accident Ins. Co.,* 360 F. Supp. 2d 1310 (N.D. Ga.

76

2005) (decision to terminate long-term disability benefits of participant who had been diagnosed with fibromyalgia and leg pain, was reasonable); *Ruiz v. Continental Ins. Co.,* 400 F.3d 986, 989 (7th Cir. 2005) ("In light of the lack of objective medical evidence supporting [the plaintiff's] claim that he can perform no work he is trained to do, and the inconsistent conclusions of physicians reviewing [his] medical records, it was not 'downright unreasonable' for [administrator] to conclude that [the plaintiff] was not entitled to long-term disability benefits.").

## VIII.  Conclusion

UNUM's task was admittedly a difficult one – how to assess whether a claimant suffering from fibromyalgia, reporting symptoms of pain, weakness, and fatigue, was disabled because these inherently subjective symptoms were so severe.  "Without an objective component to [the disability] proof requirement, administrative review of a participant's claim for benefits would be meaningless because a plan administrator would have to accept all subjective claims of the participant without question." *Williams v. UNUM Life Ins. Co. of Am.*, 250 F.Supp.2d 641, 648–49 (E.D.Va. 2003).  Adams's task was also a difficult one.  The record demonstrates that her doctors worked hard to present objective measures of the severity of the symptoms she reported.  But the presence of substantial evidence in the record supporting Adams's ability to perform the duties of "any gainful occupation" for which she was suited, and the deferential standard of review, leads this court to conclude that UNUM did not abuse its discretion in deciding that Adams was not so severely affected by fibromyalgia or her other medical conditions as to be totally disabled.

UNUM's motion for summary judgment is granted; Compaq's and Hewlett-Packard's motion to dismiss is granted; Adams's motion for leave to amend is granted; Adams's motion for partial summary judgment is denied.  Final judgment is entered by separate order.

SIGNED on August 23, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge